Jeremy D. Sacks, OSB 994262
jeremy.sacks@stoel.com
Per A. Ramfjord, OSB 934024
per.ramfjord@stoel.com
Kennon Scott, OSB 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Tel.: (503) 224-3380
Fax: (503) 220-2480
Attorneys for Plaintiffs
ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| AMERICAN MEDICAL ASSOCIATION et al., <br><br>      Plaintiffs, <br><br>   v. <br><br> ALEX M. AZAR II et al., <br><br>      Defendants. | Case No. 6:19-cv-00318-MC <br><br> PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION <br> Pursuant to Fed. R. Civ. P. 65 <br><br><br> Oral Argument Date:  April 23, 2019 <br> Expedited Hearing Requested <br> Request for Oral Argument |

PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

LOCAL RULE 7-1(a) COMPLIANCE ........................................................................ 1

MOTION ......................................................................................................................... 1

MEMORANDUM OF LAW ........................................................................................... 1

I.      INTRODUCTION ............................................................................................... 1

II.     STATEMENT OF THE CASE............................................................................ 4

        A.      The Title X Program ............................................................................. 4

                1.      Enactment and extraordinary success of Title X ..................... 4

                2.      Statutory and regulatory history concerning pregnancy counseling
                        and separation requirements ...................................................... 5

        B.      The Final Rule......................................................................................... 10

                1.      Gag Requirement ....................................................................... 10

                2.      Separation Requirement............................................................. 13

III.    LEGAL STANDARD......................................................................................... 14

IV.     ARGUMENT ....................................................................................................... 15

        A.      Plaintiffs Are Likely To Succeed On The Merits ................................ 15

                1.      The Gag Requirement's Restrictions On Pregnancy Counseling
                        Are Unlawful ............................................................................. 15

                        a.      The Gag Requirement is contrary to federal law ......................... 15

                        b.      The Gag Requirement is arbitrary and capricious ....................... 20

                2.      The Gag Requirement's Speaker-Based Ban On Who Can Provide
                        Pregnancy Counseling Is Unlawful ......................................... 24

                        a.      The speaker-based ban was promulgated without proper
                                procedure.................................................................................... 25

                        b.      The speaker-based ban is contrary to federal law ....................... 26

                        c.      The speaker-based ban is arbitrary and capricious ..................... 27

3.      The Gag Requirement Is Unconstitutional ............................................... 28

4.      The Separation Requirement Is Unlawful................................................. 31

        a.      The Separation Requirement is contrary to federal law.............. 32

        b.      The Separation Requirement is arbitrary and capricious............ 36

B.      Plaintiffs And Patients Will Suffer Irreparable Harm Absent An Injunction...... 40

        1.      Loss Of Providers, Health Center Closures, And Cut Services.............. 40

        2.      Harm To The Provider-Patient Relationship ........................................... 42

        3.      Harm To Patients And Public Health........................................................ 43

C.      The Balance Of Equities And Public Interest Favor An Injunction ................... 44

V.      CONCLUSION............................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*2Die4Kourt v. Hillair Capital Management, LLC*, 692 F. App'x 366
(9th Cir. 2017)........................................................................................................45

*Alaska Factory Trawler Association v. Baldridge*, 831 F.2d 1456 (9th Cir. 1987)......................24

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ....................................42

*American Trucking Association, Inc. v. City of Los Angeles*, 559 F.3d 1046
(9th Cir. 2009)........................................................................................................42

*Cactus Corner, LLC v. U.S. Department of Agriculture*, 346 F. Supp. 2d 1075
(E.D. Cal. 2004) ....................................................................................................36

*Cascadia Wildlands v. Carlton*, 341 F. Supp. 3d 1195 (D. Or. 2018)..........................................14

*CSX Transportation, Inc. v. Surface Transportation Bd.*, 584 F.3d 1076
(D.C. Cir. 2009) ....................................................................................................25

*Dominguez v. Schwarzenegger*, 596 F.3d 1087 (9th Cir. 2010) ....................................................45

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ........................................................37

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)............................................................37

*Habeas Corpus Resource Center v. DOJ*, 2009 WL 185423
(N.D. Cal. Jan. 20, 2009) ......................................................................................24

*hiQLabs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099 (N.D. Cal. 2017) ....................................41

*Humana, Inc. v. Jacobson*, 804 F.2d 1390 (5th Cir. 1986)............................................................42

*Janus v. American Federation of State, County & Municipal Employees,*
*Council 31*, 138 S. Ct. 2448 (2018) ......................................................................30

*Judulang v. Holder*, 565 U.S. 42 (2011)........................................................................................14

*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001) ..............................................................31

*Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual*
*Automobile Insurance Co.*, 463 U.S. 29 (1983)............................................... *passim*

*National Family Planning & Reproductive Health Association v. Sullivan*,
979 F.2d 227 (D.C. Cir. 1992) ................................................................................7

*National Federation of Independent Business v. Perez*, 2016 WL 3766121
  (N.D. Tex. June 27, 2016) ..................................................................................37

*National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ............. *passim*

*Natural Resource Defense Council, Inc. v. EPA*, 859 F.2d 156 (D.C. Cir. 1988) ........................37

*Natural Resource Defense Council, Inc. v. Pritzker*, 828 F.3d 1125 (9th Cir. 2016) .............24, 36

*Natural Resource Defense Council v. EPA*, 279 F.3d 1180 (9th Cir. 2002) ...............................25

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................44

*Occupy Eugene v. U.S. General Services Administration*, 43 F. Supp. 3d 1143
  (D. Or. 2014) ...................................................................................................14

*Planned Parenthood Arizona, Inc. v. Betlach*, 899 F. Supp. 2d 868
  (D. Ariz. 2012) .................................................................................................44

*Planned Parenthood of Greater Texas Family Planning & Preventative Health
  Services, Inc. v. Smith*, 236 F. Supp. 3d 974 (W.D. Tex. 2017) ...............................45

*Pomerantz ex rel. NLRB v. International Longshore & Warehouse Union,
  Local 4*, 2013 WL 5651624 (D. Or. Oct. 15, 2013) .................................................42

*Puente Arizona v. Arpaio*, 821 F.3d 1098 (9th Cir. 2016) ............................................14

*Recycle for Change v. City of Oakland*, 856 F.3d 666 (9th Cir. 2017) ...........................14

*Robertson v. Seattle Audubon Society*, 503 U.S. 429 (1992) ........................................15

*Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004) ...........................................................43

*Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995) ......................31

*Rust v. Sullivan*, 500 U.S. 173 (1991) .................................................................. *passim*

*Santa Rosa Memorial Hospital v. Maxwell-Jolly*, 380 F. App'x 656
  (9th Cir. 2010) .................................................................................................45

*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005) ...............................45

*Stuhlbarg International Sales Co., v. John D. Brush & Co.*, 240 F.3d 832
  (9th Cir. 2001) .................................................................................................43

*Tenet v. Doe*, 544 U.S. 1 (2005) .............................................................................29

*United States v. Ye*, 808 F.3d 395 (9th Cir. 2015) ......................................................29

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)................................................................................................31

*Vivid Entertainment, LLC v. Fielding*, 774 F.3d 566 (9th Cir. 2014)...........................14

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ........................................................................................ *passim*

## STATUTES

5 U.S.C.
§ 553.....................................................................................................................25
§ 702.....................................................................................................................42
§ 706..............................................................................................................14, 26

42 U.S.C.
§ 238n...................................................................................................................19
§ 300.................................................................................................................2, 4
§ 300a-5 ...........................................................................................................2, 4
§ 300a-6 .........................................................................................................5, 35
§ 18114 ........................................................................................................ *passim*

Consolidated Appropriations Act, 2016,
Pub. L. No. 114-113, 129 Stat. 2242 (2015)........................................................19

Department of Health and Human Services Appropriations Act, 1996,
Pub. L. No. 104-134, 110 Stat. 1321 (1996)..........................................................8

Department of Health and Human Services Appropriations Act, 2019,
Pub. L. No. 115-245, 132 Stat. 2981 (2018)..............................................2, 8, 15

Family Planning Services and Population Research Act of 1970,
Pub. L. No. 91-572, 84 Stat. 1504 (1970)..............................................................4

## RULES & REGULATIONS

Fed. Rule of Civ. Proc. 65...............................................................................................1

Local Rule 7-1...................................................................................................................1

42 C.F.R.
§ 59.5............................................................................................................. *passim*
§ 59.9.............................................................................................................9, 36

*Compliance with Statutory Program Integrity Requirements*,
84 Fed. Reg. 7,714 (Mar. 4, 2019)................................................................. *passim*

*Compliance with Statutory Program Integrity Requirements,*
    83 Fed. Reg. 25,502 (June 1, 2018) .................................................................10, 26

*Memorandum for the Secretary of Health and Human Services,*
    58 Fed. Reg. 7,455 (Feb. 5, 1993) ..........................................................................7

*Standards of Compliance for Abortion-Related Services in Family Planning*
    *Services Projects*, 65 Fed. Reg. 41,270 (July 3, 2000) ................................... *passim*

*Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion*
    *is a Method of Family Planning; Standard of Compliance for Family*
    *Planning Services Projects*, 53 Fed. Reg. 2,922 (Feb. 2, 1988) ...............................6

*Provision of Abortion-Related Services in Family Planning Services Projects*,
    65 Fed. Reg. 41,281 (July 3, 2000).........................................................6, 9, 13, 37

## LEGISLATIVE MATERIALS

H. R. Rep. No. 91-1472 (1970).................................................................................35

124 Cong. Rec. 37,046 (1978)...................................................................................36

## OTHER AUTHORITIES

AMA, Code of Medical Ethics .............................................................................18, 19

Berg, Paula, *Toward a First Amendment Theory of Doctor-Patient Discourse and*
    *the Right to Receive Unbiased Medical Advice*, 74 B. U. L. Rev. 201 (1994) .................29, 30

CDC, *Providing Quality Family Planning Services* (2014) ...........................................24

Goldberg, Debora Goetz, et al., *Team Based Care: A Critical Element of Primary*
    *Care Practice Transformation,* 16 Pop. Health Mgmt. 3 (2013)............................28

Greenwood, Max, *Trump: Planned Parenthood Cuts Will Come "At the*
    *Appropriate Time,"* The Hill, May 2, 2017 ...........................................................21

Haberman, Maggie, *Trump Tells Planned Parenthood Its Funding Can Stay If*
    *Abortion Goes*, N.Y. Times, Mar. 6, 2017.............................................................21

Senator Murray, Patty, Ltr. to U.S. Senate Committee on Health, Education,
    Labor, and Pensions (July 5, 2018)...................................................................21, 22

*Office of Population Affairs, Title X Family Planning Annual Report: 2017*
    *National Summary* (Aug. 2018).............................................................................26

Paquette, Danielle, *Donald Trump's Incredibly Bizarre Relationship with Planned*
    *Parenthood*, Wash. Post., Mar 2, 2016.................................................................21

**COMMENT LETTERS**

American Civil Liberties Union ("ACLU") Comment Ltr. (July 31, 2018)
https://www.regulations.gov/document?D=HHS-OS-2018-0008-190184.............................38

American College of Obstetricians and Gynecologists ("ACOG") Comment Ltr. (July 31,
2018) https://www.regulations.gov/document?D=HHS-OS-2018-0008-179339 ..................24

American Medical Association ("AMA") Comment Ltr. (July 31, 2018)
https://www.regulations.gov/document?D=HHS-OS-2018-0008-179739...................... *passim*

American Academy of Nursing Comment Ltr. (July 26, 2018)
https://www.regulations.gov/document?D=HHS-OS-2018-0008-106624.......................19, 26

Association of Women's Health, Obstetric and Neonatal Nurses Comment Ltr. (July 31,
2018) https://www.regulations.gov/document?D=HHS-OS-2018-0008-182434 ..................19

Attorneys General for Washington, Oregon, Vermont, and Massachusetts
("WA, OR, VT, MA AGs") Comment Ltr. (July 31, 2018)
https://www.regulations.gov/document?D=HHS-OS-2018-0008-182278.............................21

Essential Access Health ("EAH") Comment Ltr. (July 30, 2018)
https://www.regulations.gov/document?D=HHS-OS-2018-0008-161651.............................22

Brindis, Claire, Comment Ltr. (July 31, 2018)
https://www.regulations.gov/document?D=HHS-OS-2018-0008-204364.................21, 23, 44

Guttmacher Institute Comment Ltr. (July 31, 2018)
https://www.regulations.gov/document?D=HHS-OS-2018-0008-178129...................... *passim*

National Health Law Program Comment Ltr. (July 31, 2018)
https://www.regulations.gov/document?D=HHS-OS-2018-0008-190098.............................27

National Family Planning & Reproductive Health Association ("NFPHRA")
Comment Ltr. (July 31, 2018)
https://www.regulations.gov/document?D=HHS-OS-2018-0008-192227.................20, 38, 39

New York State Department of Health Comment Ltr. (July 30, 2018)
https://www.regulations.gov/document?D=HHS-OS-2018-0008-155772.............................33

Planned Parenthood ("PPFA") Comment Ltr. (July 31, 2018)
https://www.regulations.gov/document?D=HHS-OS-2018-0008-198841...................... *passim*

Ryan Health Comment Ltr. (July 31, 2018)
https://www.regulations.gov/document?D=HHS-OS-2018-0008-183710.............................23

## LOCAL RULE 7-1(a) COMPLIANCE

As required by Local Rule 7-1(a), counsel for Plaintiffs certifies that the parties have made a good faith effort by telephone conference to resolve the issues presented in this motion and have been unable to reach any such resolution.

## MOTION

Under Federal Rule of Civil Procedure 65, Plaintiffs move for a preliminary injunction prohibiting Defendants from enforcing the final rule titled *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7,714 (Mar. 4, 2019) ("Final Rule").  Absent an injunction, the Final Rule would become effective on May 3, 2019.  Plaintiffs respectfully request a ruling on this motion on or before May 2, the day before the effective date.  Plaintiffs request that an injunction be granted without bond.  This motion is based on the complaint, the accompanying memorandum of law, and supporting declarations.[1]

## MEMORANDUM OF LAW

## I.    INTRODUCTION

Congress created the Title X program nearly a half-century ago to ensure that all people, and especially individuals with low incomes, have access to comprehensive family-planning care.  Under regulations that have been largely unchanged since the statute's enactment, the Title X program has accomplished its vital mission through a network of experienced reproductive health care providers who have earned the trust of millions of Americans turning to them for

---

[1]    The 11 declarations submitted in support of this motion include the following: Declaration of Kimberly Custer (Mar. 21, 2019); Declaration of Lisa Gardner (Mar. 20, 2019); Declaration of Dr. Anne Udall (Mar. 20, 2019); Declaration of Dr. Thomas N. Ewing (Mar. 21, 2019); Declaration of Michele P. Megregian, C.N.M. (Mar. 20, 2019); Declaration of Dr. Fred Williams (Mar. 20, 2019); Declaration of Dr. James L. Madara (Mar. 21, 2019); Declaration of Tanya Atkinson (Mar. 19, 2019); Declaration of Jennifer Black (Mar. 20, 2019); Declaration of Claire D. Brindis, DrPH (Mar. 21, 2019); Declaration of Kathryn Kost (Mar. 20, 2019).

life-saving services.  The Title X program has been one of the most successful public health programs in our nation's history, significantly reducing the rates of unintended pregnancy and abortion, and yielding vast benefits for sexual and reproductive health.

The federal government now seeks to impose a radical change of course.  Under the guise of "program integrity," the Department of Health and Human Services ("HHS") has issued an unlawful Final Rule that would warp and decimate the Title X program.  The Final Rule would harm patients and providers, politicize the practice of medicine and the delivery of health care, and advance a dangerous idea—that physicians and others in the medical profession are to place the interests of government above the interests of their patients.  Accordingly, Plaintiffs—leading local and national health care organizations, including the American Medical Association and Planned Parenthood, and individual health care professionals—move for a preliminary injunction against the Final Rule's enforcement.  Absent injunctive relief, it will take effect 43 days from today, on May 3, 2019.

The Final Rule operates through two central and integrated provisions:

- a gag on the medical profession requiring that practitioners in the Title X program *direct* pregnant women away from abortion and toward continuing a pregnancy to term—regardless of what a patient actually wants or needs (the "Gag Requirement"); and

- "physical and financial" separation requirements under which Title X providers having virtually anything to do with abortion—including advising patients about or providing abortions with *non*-Title X funds—must now, at immense cost, create separate facilities and health care records systems and hire separate personnel (the "Separation Requirement").

The Final Rule is unlawful.  To start, it violates at least three federal laws.  It contravenes the repeated congressional mandates that "all pregnancy counseling" under Title X be "nondirective," *e.g.*, Pub. L. No. 115-245, 132 Stat. 2981, 3070-3071 (2018); that Title X services be "voluntary," 42 U.S.C. §§ 300, 300a-5; and that HHS shall not promulgate "any"

regulation that, among other things, "interferes with communications regarding a full range of treatment options between the patient and the provider" or "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions," 42 U.S.C. § 18114.  The Final Rule is also unconstitutional, in violation of the First Amendment.  Indeed, the Supreme Court recently warned against precisely what the Final Rule would accomplish—"government[] … 'manipulat[ion]'" of the "'content of doctor-patient discourse.'"  *National Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2374 (2018) ("*NIFLA*").

The Final Rule is also arbitrary and capricious in numerous respects.  In particular, it will lead to a mass exodus of providers from the Title X program, leaving many patients without access to health care.  Virtually all the leading health organizations in the United States warned HHS of precisely that devastating consequence and more, including major gaps in access to care, harm to public health, and immense cost.  HHS's silence in response is deafening.  The Final Rule ignores or sweeps away these grave problems without evidence or analysis, and identifies *no* discernible public health benefit of its radical approach.

HHS's silence, moreover, betrays yet another core flaw.  The Final Rule is plagued by rigid adherence to ideological policy preferences with no grounding in evidence, law, or public health.  For example, the Separation Requirement is purportedly designed to protect Title X funds from misapplication—but in the Final Rule, HHS cites *no evidence* of misuse of Title X funds *over the past 50 years*.  Nonetheless, citing nothing more than vague notions of "risk[s]" of "appearance[s]" and "perception[s]," 84 Fed. Reg. at 7,764, the Final Rule would impose sweeping requirements on Title X providers that would harm patient care at great cost.

Finally, Plaintiffs easily satisfy the remaining preliminary-injunction factors:  irreparable

harm, balance of equities, and public interest.  The government is seeking to upend the way the Title X program has functioned with great success for nearly 50 years.  There is no harm in preserving that status quo.  Conversely, if the Gag Requirement alone takes effect on May 3, Planned Parenthood and numerous States will be forced to leave the program that same day. Planned Parenthood alone provides care to an estimated 40% of *all* Title X patients— approximately 1.6 *million* people nationwide.  Put simply, the impact of the Final Rule absent an injunction will be nothing short of a public health crisis.

## II.    STATEMENT OF THE CASE

### A.    The Title X Program

#### 1.    Enactment and extraordinary success of Title X

Enacted in 1970, the Title X program makes family-planning services available to low-income individuals for free or at low cost.  *See* 42 U.S.C. §§ 300 et seq.; Compl. ¶¶ 55-59.  Title X's central purpose is "to assist in making comprehensive voluntary family planning services readily available to all persons desiring such services."  Pub. L. No. 91-572, § 2(1), 84 Stat. 1504 (1970).  The program supports a broad range of reproductive health care, including contraception, testing and referral for sexually transmitted infections ("STIs"), well-woman visits and breast and cervical cancer screening, and pregnancy testing and counseling, including referrals.  These services must always be "voluntary," 42 U.S.C. §§ 300, 300a-5, and "never coercive," *e.g.*, 84 Fed. Reg. at 7,728.

The Title X program serves millions of patients each year with enormous benefits.  *See, e.g.*, Compl. ¶¶ 73-89.  Title X providers, for example, regularly provide millions of patients with contraceptive services, significantly reducing the rates of unintended pregnancy and abortion, *see, e.g.*, Kost Decl. ¶¶ 7, 35; both unintended pregnancies and abortions are now at historical lows.  And through millions of tests for STIs and cancer screens, the Title X program

has also contributed to the prevention, early detection, and treatment of STIs and the prevention and early detection of cervical cancer. *See, e.g.*, *id.* ¶¶ 52-58.

Plaintiffs are leading local and national health care organizations and individual health care professionals. They have participated, themselves or through their members or affiliates, in the Title X program for decades, and are deeply committed to and supportive of Title X's mission. *See, e.g.*, Custer Decl. ¶ 48; Madara Decl. ¶ 7; Williams Decl. ¶ 8; Gardner Decl. ¶¶ 4, 34-38; Udall Decl. ¶¶ 29-30; Ewing Decl. ¶¶ 19-21; Megregian Decl. ¶ 24. Plaintiffs' experiences—and in particular, that of Planned Parenthood—bear out and underscore the importance and success of the Title X program.

Planned Parenthood operates more than 600 health centers across the nation and serves approximately 2.4 million patients each year. In 2017, Planned Parenthood affiliates provided health care services to approximately 40% of all the patients who received care in the Title X program—1.6 million patients. *See* Custer Decl. ¶¶ 8, 50. Through the Title X program, in 2017 alone, Planned Parenthood health centers provided an estimated 183,000 Pap tests, 2,720,000 STI tests, and 196,000 breast exams. *See id.* ¶ 52. Planned Parenthood affiliates are safety-net providers who serve those with the fewest resources, and operate on tight budgets focused on patient care and education services. *See, e.g.*, Atkinson Decl. ¶¶ 11, 61.

### 2. Statutory and regulatory history concerning pregnancy counseling and separation requirements

This case involves Section 1008 of Title X, which provides that no Title X funds "shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. That provision, in the statute since its enactment, prohibits Title X projects from using Title X funds to provide abortions. But it does not seek to interfere with *communications* between Title X providers and their patients about abortion—as Congress and HHS have repeatedly confirmed.

*See* Compl. ¶ 60; 65 Fed. Reg. 41,270, 41,270, 41,271 (July 3, 2000) (describing history).

Thus, Title X regulations have long required that Title X providers must:  (1) *offer* a pregnant patient the opportunity to receive nondirective counseling on *all* her medical options, including counseling on and referral for prenatal care, adoption, and abortion; and then (2) *if requested by the patient*, actually provide the counseling she seeks.  *See, e.g.*, 42 C.F.R. § 59.5(a)(5); 65 Fed. Reg. at 41,270.  That settled agency view is grounded in fundamental ethical tenets of the medical profession and ensures full and frank communications between providers and patients.  *See, e.g.*, 65 Fed. Reg. at 41,270; Compl. ¶¶ 90-99; Ewing Decl. ¶¶ 14-17; Megregian Decl. ¶¶ 33-36; Madara Decl. ¶¶ 17-20; AMA Comment Ltr. 1 (July 31, 2018).

Moreover, since the statute's inception, Title X care has been delivered in many communities by expert reproductive health care providers like Planned Parenthood who—*outside* the program with *non*-Title X funds—also provide abortion services.  In accordance with Section 1008, those providers must ensure that Title X funds are not used for any "[n]on-Title X abortion activities."  65 Fed. Reg. 41,281, 41,282 (July 3, 2000).  Title X providers have long demonstrated compliance with that requirement "by various means, including counseling and service protocols, intake and referral procedures, material review procedures, and other administrative procedures."  *Id.*  With one exception long ago abandoned, Title X providers have never been required to "physically" separate their Title X program from non-Title X abortion-related services through separate facilities, personnel, and file systems.  *See id.* at 41,275-41,276.

The one brief exception to this long settled regulatory scheme was in 1988, when HHS issued a rule that prohibited Title X projects from "provid[ing] counseling concerning the use of" or "provid[ing] referral" for abortion.  53 Fed. Reg. 2,922, 2,945 (Feb. 2, 1988).  The 1988 rule further required providers to broadly "physically" separate their Title X project services and any

non-Title X abortion-related services, *id.* at 2,940, including through "separat[e] … facilities,"

"separate personnel," and "separate accounting records," *id.* at 2,945; *see* 65 Fed. Reg. at 41,275

(discussing 1988 rule).

The 1988 rule faced vast opposition and was also the subject of extensive litigation.  The

Supreme Court, by a vote of 5-4, ultimately upheld that rule against certain facial statutory and

constitutional challenges in *Rust v. Sullivan*, 500 U.S. 173 (1991).  But HHS did a "'volte face'"

just six months later.  *National Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d

227, 235 (D.C. Cir. 1992).  "[R]esponding to widespread concerns that [the 1988 rule] would

interfere with the doctor-patient relationship," President George H. W. Bush issued a directive to

his HHS Secretary "cutting back significantly on [the rule's] scope and proscriptions."  *Id.* at

230, 235.  As President Bush described it:  "'[U]nder my directive, … patients and doctors can

talk about absolutely anything they want, and they should be able to do that.'"  *Id.* at 230.  But

this recasting of the 1988 rule, done without notice and comment, was limited to doctors; nurses

and others were still prohibited from providing information to patients about abortion.  And that

led to additional litigation, which led to an injunction against the rule.  *See id.*

The 1988 rule was never fully implemented.  When President Bill Clinton took office, he

directed his HHS Secretary to suspend the 1988 rule because it "endanger[ed] women's lives and

health" and "interfer[ed] with the doctor-patient relationship by prohibiting information that

medical professionals are otherwise ethically and legally required to provide to their patients."

58 Fed. Reg. 7,455 (Feb. 5, 1993).  HHS undertook the effort to promulgate new regulations.  *Id.*

In the meantime, Congress acted to ensure the sanctity of the provider-patient

relationship.  The government—Congress has repeatedly made clear—must not interfere with

full and frank communications between medical professionals and their patients, including on

abortion. Thus, beginning in 1996 and every year since then, Congress has mandated in Title X appropriations acts that "all pregnancy counseling" under Title X "shall be nondirective." Pub. L. No. 115-245, 132 Stat. 2981, 3070-3071 (2018) (hereinafter, the "Nondirective Mandate"); Pub. L. No. 104-134, 110 Stat. 1321-221 (1996). As HHS acknowledges in the Final Rule, nondirective counseling means the "meaningful presentation of options" without "'suggesting or advising one option over another.'" 84 Fed. Reg. at 7,716. Consistent with fundamental ethical principles of the medical profession, such counseling ensures that patients "take an active role in processing their experiences and identifying the direction of their interaction." *Id.*

In 2000, consistent with Congress's repeated Nondirective Mandate, HHS issued a rule that formally eliminated the 1988 rule's gag and separation requirements, and that requires—upon a patient's request—"nondirective counseling" on all pregnancy options. 65 Fed. Reg. at 41,270; 42 C.F.R. § 59.5(a)(5). As HHS explained at the time, "[t]he policies reflected in, and interpretations reinstituted in conjunction with, the [2000 rule] … have been used by the program for virtually its entire history; indeed, they have been in effect during the pendency of this rulemaking." 65 Fed. Reg. at 41,271. Thus, the 2000 rule reaffirmed that a Title X project *must*

> (i) *Offer* pregnant women the opportunity to be provided information and counseling regarding each of the following options: (A) Prenatal care and delivery; (B) Infant care, foster care, or adoption; and (C) Pregnancy termination.
>
> (ii) *If requested to provide such information and counseling*, provide neutral, factual information and nondirective counseling on each of the options, and referral upon request, except with respect to any option(s) about which the pregnant woman indicates she does not wish to receive such information and counseling.

42 C.F.R. § 59.5(a)(5) (emphasis added).

In issuing the 2000 rule, HHS recognized that Congress made clear the importance of the nondirective counseling mandate. 65 Fed. Reg. at 41,273. HHS further emphasized the

importance of ensuring that counseling be governed by what a patient actually wants.  "If projects were to counsel on an option even where a client indicated that she did not want to consider that option," HHS warned, "there would be a real question as to whether the counseling was truly nondirective or whether the client was being steered to choose a particular option."  *Id.*

As noted, the 2000 rule also repudiated the 1988 rule's separation provisions.  It reaffirmed that Title X funds must "be expended solely for the purpose for which the funds were granted in accordance with … applicable cost principles," 42 C.F.R. § 59.9, that Title X funds may not be used to perform abortions, *id.* § 59.5, and that Title X providers must ensure that "[n]on-Title X abortion activities … be separate and distinct from Title X projects," 65 Fed. Reg. at 41,282.  But it did *not* require that Title X projects be operated out of separate facilities or employ separate staff from such activities, recognizing that such physical separation contemplated by the 1988 rule was inconsistent "with the efficient and cost-effective delivery of family planning services."  65 Fed. Reg. at 41,276.  The 2000 rule expressly authorized the use of "shared facilities," "common staff," and "single file system[s]."  65 Fed. Reg. at 41,282.

Ten years after the 2000 rule was issued, as part of the Affordable Care Act, Congress acted again to protect the provider-patient relationship from government interference.  Reflecting the core principles underlying the Nondirective Mandate, Congress declared that HHS

> shall not promulgate any regulation that—(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and the provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; (5) violates the principles of informed consent and the ethical standards of health care professionals; or (6) limits the availability of health care treatment for the full duration of a patient's medical needs.

Pub. L. No. 111-148, § 1554, 124 Stat. 259 (codified at 42 U.S.C. § 18114).

### B.    The Final Rule

Notwithstanding the success of the Title X program under regulations largely unchanged for decades, in June 2018, HHS proposed a radical change of course.  83 Fed. Reg. 25,502 (June 1, 2018).  Touting the proposed rule at a major anti-abortion organization's gala, President Donald Trump underscored one of its obvious purposes—an attack on safe and legal abortion, which has been an express and unalterable goal of this Administration.  "My administration," President Trump offered, "has proposed a new rule to prohibit Title 10 funding from going to any clinic that performs abortions." *Remarks by President Trump at the Susan B. Anthony List 11th Annual Campaign for Life Gala*, White House.gov (May 22, 2018); *see infra* p.21 n.4, p.40.

That proposal was opposed by virtually every leading health care organization in the United States, including the AMA and Planned Parenthood. *See, e.g.*, Compl. ¶ 107.  Planned Parenthood warned that the proposal would result in a mass exodus of providers from the Title X program—including all Planned Parenthood affiliates and numerous States—leaving vast numbers of patients without access to care.  *See generally* PPFA Comment Ltr. 15-16 (July 31, 2018).  The AMA also voiced its strong opposition, explaining that the proposal would dangerously interfere with the patient-physician relationship and conflict with physicians' ethical obligations.  *See* AMA Comment 1-5.

HHS issued the Final Rule on March 4, 2019, and set an effective date of 60 days later—May 3.  As relevant here, with one exception described below concerning a new speaker-based ban, HHS largely adopted the proposed rule without material change.  As with the proposal, the Final Rule consists of two central, integrated provisions—the Gag and Separation Requirements.

### 1.    Gag Requirement

The Final Rule imposes broad restrictions on what health care providers under the Title X program may inform pregnant patients—even when the patient wants an abortion, and when an

abortion would be in the patient's best medical interest.  *See* Compl. ¶¶ 117-135 (describing the Gag Requirement).  First, the Final Rule *prohibits* providers from making referrals for abortion while it *mandates* that providers make referrals for prenatal care.  84 Fed. Reg. at 7,788 (to be codified at 42 C.F.R. §§ 59.5(a)(5), 59.14(a) (abortion-referral ban)); *id.* at 7,789 (to be codified at 42 C.F.R. § 59.14(b)(1) (prenatal referral mandate)).  In other words, Title X providers must *not* tell pregnant patients how and where they can obtain abortion services safely and legally, but they *must* provide that information as to prenatal care.

The Final Rule touts that Title X providers may provide their patients a "list" of certain providers, notwithstanding the abortion-referral ban.  84 Fed. Reg. at 7,789 (to be codified at 42 C.F.R. § 59.14(c)(2)).  But if anything this list makes things worse.  "[W]here a pregnant woman asks for an abortion or an abortion referral," *id.* at 7,761, a Title X provider may *only* give her— at most—a list that must *include* providers who do not provide abortion; must *exclude* specialized reproductive health care providers; and must *not* identify which of the providers actually provide abortion services, *id.* at 7,789 (to be codified at 42 C.F.R. § 59.14(c)(2)).  The list must therefore conceal from the patient which providers—if any, *see* Kost Decl. ¶ 89—would be willing to provide abortion services, and must not inform the patient about the providers who would be most likely to offer abortion services.

The Final Rule provides only a limited exception for abortion referrals in the case of "emergenc[ies]."  The Final Rule purports to allow for "medically necessary" referrals.  84 Fed. Reg. at 7,788 (to be codified at 42 C.F.R. § 59.5(b)(1)).  But such referrals must be "consistent with § 59.14(a)," *id.*—under which referrals for abortions are banned—and the Final Rule otherwise states that only an abortion referral for an "emergency medical situation" would fall

outside the "restrictions concerning abortion as a method of family planning," *id.* at 7,762.[2]

Second, HHS eliminated the prior settled regulatory requirement that Title X providers *must* offer pregnant patients the opportunity to receive nondirective, comprehensive counseling on their pregnancy options and, if patients so request it, actually provide that counseling. *E.g.*, 84 Fed. Reg. at 7,716. Instead, under the Final Rule, Title X providers may tell pregnant patients about only *some* of their options and may exclude *any* information about abortion. And even when a patient says she is only interested in information and counseling on abortion, the Final Rule requires that practitioners disregard that patient decision; instead, the Final Rule compels practitioners to speak to the patient about other options she *does not* want, and, in all instances, to tell her about the "risks and side effects to both [her] and unborn child." *Id.* at 7,747; *see id.* ("abortion must not be the only option presented"). Thus, although the Final Rule claims that this allows certain Title X providers to provide "nondirective" counseling to pregnant patients, in fact the rule permits nothing of the sort.

Third, only "physicians or advanced practice providers" may provide what HHS calls "nondirective" "pregnancy counseling." 84 Fed. Reg. at 7,789 (to be codified at 42 C.F.R. § 59.14(b)(1)(i)). The Final Rule defines "advanced practice providers" ("APPs") as follows: "a medical professional who receives at least a graduate level degree in the relevant medical field and maintains a license to diagnose, treat, and counsel patients." *Id.* at 7,787 (to be codified at 42 C.F.R. § 59.2). Thus, under the Final Rule, all medical professionals other than doctors or APPs are barred from counseling patients about their "pregnancy" options. Among others falling

---

[2]    "[I]n cases involving rape and/or incest," the Final Rule would prohibit Title X providers from referring a patient to a specialized reproductive health care provider, instead permitting only a referral to a "qualified, comprehensive health service provider who *also* provides abortion." 84 Fed. Reg. at 7,747 n.76 (emphasis added).

within the scope of this ban are registered nurses and health care assistants—vital medical professionals in the Title X program who regularly and effectively provide this counseling. This speaker-based ban on speech was nowhere hinted at in the proposed rule. The Final Rule provides no explanation for it, and does not recognize or attempt to justify the consequences that would result from it, including increased costs and delays and disruptions in patient care.

### 2. Separation Requirement

The Final Rule's second core provision, the Separation Requirement, imposes onerous and vague "physical and financial" separation requirements on Title X providers that engage in so-called "prohibited activities"—defined to include virtually anything having to do with abortion. *See* 84 Fed. Reg. at 7,789 (to be codified at 42 C.F.R. § 59.15); Compl. ¶¶ 136-143.

As discussed, longstanding regulations have required that Title X providers ensure that "[n]on-Title X abortion activities … be separate and distinct from Title X project activities," while expressly authorizing shared facilities, health care records, and personnel. 65 Fed. Reg. at 41,282. Title X providers who also provide abortions with non-Title X funds have participated in the program since its inception, complying with those requirements. Nonetheless, citing *no* evidence of misuse of Title X funds over the past half century, the Final Rule would impose new and sweeping requirements—mandating entirely separate facilities, separate personnel and workstations, and separate health care records—on Title X providers that engage in abortion-related activities. *See* 84 Fed. Reg. at 7,789 (to be codified at 42 C.F.R. § 59.15). Moreover, the HHS Secretary is to judge whether a provider complies under a boundless, discretionary standard of "objective integrity and independence … based on a review of facts and circumstances." *Id.*

The "prohibited activities" are defined by cross-reference to other sections of the rule, including the Gag Requirement. 84 Fed. Reg. at 7,789 (to be codified at 42 C.F.R. § 59.15). Those "prohibited activities" include not only the provision of abortion with non-Title X funds,

*id.* at 7,788 (to be codified at 42 C.F.R. § 59.14(a)), but also abortion referrals, *id.* at 7,789, or anything that otherwise "encourage[s], promote[s], or advocate[s]" for abortion, *id.* (to be codified at 42 C.F.R. § 59.16)—and going so far as to reach abortion-related "brochures … sitting on a table … within the same space where Title X services are provided," *id.* at 7,790 (to be codified at § 59.16(b)(1)).

## III.    LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish:  (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest." *Cascadia Wildlands v. Carlton*, 341 F. Supp. 3d 1195, 1199 (D. Or. 2018) (McShane, J.); *see, e.g.*, *Vivid Entm't, LLC v. Fielding*, 774 F.3d 566, 577 (9th Cir. 2014).  "'[A] stronger showing of one element may offset a weaker showing of another.'" *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017).  A preliminary injunction is thus warranted when the plaintiff raises only "serious questions" on the merits if "the balance of hardships tips sharply in [the plaintiff's] favor." *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1103 n.4 (9th Cir. 2016).

Plaintiffs challenge the Final Rule under the Administrative Procedure Act.  The APA requires a court to "hold unlawful and set aside agency action" found to be arbitrary, capricious, contrary to law or constitutional right, or adopted without proper procedure.  5 U.S.C. § 706(2). The "arbitrary [or] capricious" standard "ensur[es] that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 52-53 (2011).  Agencies fail to do so when, for example, they "entirely fail[] to consider an important aspect of the problem" or "offer[] an explanation … that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983); *see Occupy Eugene v. U.S. Gen. Servs. Admin.*, 43 F. Supp. 3d 1143, 1148-1149 (D. Or. 2014) (McShane, J)

IV.    **ARGUMENT**

    A.    **Plaintiffs Are Likely To Succeed On The Merits**

        1.    **The Gag Requirement's Restrictions On Pregnancy Counseling Are Unlawful**

Through the Gag Requirement, the Final Rule imposes a content-based and viewpoint-based gag on speech that would require that practitioners in the Title X program direct pregnant women toward continuing a pregnancy to term—regardless of what a patient actually wants. Those restrictions contravene federal law and are arbitrary and capricious.

        a.    **The Gag Requirement is contrary to federal law**

*i. The Nondirective Mandate and the "voluntary" requirement in Title X.*  The Nondirective Mandate—enacted by Congress every year since 1996—requires that pregnancy counseling by Title X projects be "nondirective."  *E.g.*, Pub. L. No. 115-245, 132 Stat. 2981, 3070-3071 (2018).  It is established that Congress can legislate through appropriations enactments, *see, e.g.*, *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992), and HHS concedes—as it must—that it is bound by this mandate, *e.g.*, 84 Fed. Reg. at 7,725.  HHS further concedes that this mandate requires the presentation of all medically appropriate options without "'suggesting or advising one option over another.'"  *Id.* at 7,716.  In HHS's own words, this mandate seeks to ensure that *patients* "take an active role in processing their experiences and identifying the direction of the interaction," thereby "promot[ing] the [patient's] self-awareness and empower[ing] the [patient] to be informed about a range of options."  *Id.*

The Nondirective Mandate fits hand in glove with the related statutory requirement that Title X services be "strictly voluntary" and "never … coercive."  84 Fed. Reg. at 7,731.  As HHS previously warned, if projects were to disregard patient decisions about their health care and, for example, provide information that the patient does not want or need, "there would be a real

question as to whether the counseling was truly nondirective or whether the client was being steered to choose a particular option." 65 Fed. Reg. at 41,273.

The Gag Requirement would turn this settled statutory scheme on its head. It would force Title X projects to steer women away from one particular option, abortion, while directing them toward another option, carrying the pregnancy to term. It would do so by *banning* referrals for abortions while *mandating* referrals for prenatal care, regardless of what a patient actually wants. That is a paradigmatic example of directive and coercive counseling. *See, e.g.*, Ewing Decl. ¶ 30; Madara Decl. ¶ 26; Williams Decl. ¶¶ 3, 11-12; Megregian Decl. ¶ 29; Kost Decl. ¶ 91; 65 Fed. Reg. at 41,275 ("requiring a referral for prenatal care … where the client rejected th[at] option[] would seem coercive and inconsistent with the concerns underlying the 'nondirective' counseling requirement"). In clear contravention of both the Nondirective Mandate and Title X's "voluntary" requirements, HHS would force patients to *involuntarily* receive information they do not want.

The Gag Requirement would also bless biased and incomplete pregnancy counseling. *See supra* p.12. Specifically, it would authorize Title X providers to tell pregnant patients about only *some* of their options and exclude *any* information about abortion. In practical terms, this means that when a pregnant patient sees her Title X provider, that provider can tell her she has two options: carrying to term or adoption—and limit the information offered and provided to those two. And it would further compel speech from those Title X providers that would counsel on abortion upon a patient's request. *See id.* In particular, for those providers who would, consistent with the standard of care and their ethical and professional obligations, counsel on abortion when a patient requests it, the Final Rule would compel them to speak on other options even if the patient does not want to hear about them and thus violates their professional and

ethical responsibilities.  The Gag Requirement warns that "abortion must not be the only option presented" and that, in all instances, practitioners must tell pregnant patients—even those interested only in an abortion—about the "risks and side effects to both [her] and unborn child." 84 Fed. Reg. at 7,747.  Excluding any discussion of a medical option, and providing information about an option that a patient does not want, are the opposite of what is required by law— patient-driven voluntary, nondirective counseling.  *See, e.g.*, Ewing Decl. ¶ 40; 65 Fed. Reg. at 41,273 ("removing an option from the client's consideration necessarily steers her toward the options presented and is a directive form of counseling").

Finally, HHS touts that the Final Rule authorizes a so-called "list" that a practitioner may give to her patients.  If anything, this list makes things worse.  It is incomplete, misleading, and again directive.  As HHS envisions it, a Title X provider would provide this list "where a pregnant woman asks for an abortion or an abortion referral."  84 Fed. Reg. at 7,761.  But this list *must* include providers who do not provide abortion, must *not* identify which if any providers actually provide abortion, and *could* include no abortion providers whatsoever—in particular, it must not include the specialized reproductive health care providers who are most likely to provide abortions.  *See supra* p.11.  The only apparent purpose is to direct pregnant patients away from abortion and toward continuing a pregnancy to term.

*ii.  Section 18114.*  For similar reasons, these restrictions also violate Congress's prohibitions in 42 U.S.C. § 18114 against "any" HHS regulation that interferes with the provider-patient relationship or creates unreasonable barriers to appropriate medical care.  *See supra* p.9 (quoting § 18114).

The Final Rule directly interferes with the provider-patient relationship by dictating what a provider may and may not say to her patient about her pregnancy options.  By doing so, the

Final Rule necessarily "interferes with communications regarding a *full range of treatment options* between the patient and the provider" and "restricts the ability of health care providers to provide *full disclosure of all relevant information* to patients making health care decisions." 42 U.S.C. § 18114(3), (4) (emphasis added). Furthermore, by prohibiting Title X projects from providing information about where a pregnant patient can obtain abortion services, the Gag Requirement will also delay and disrupt Title X patients' care, thereby "creat[ing] … unreasonable barriers to [patients'] ability … to obtain appropriate medical care" and "imped[ing] timely access to health care services." *Id.* § 18114(1), (2); *see* Ewing Decl. ¶ 34; Megregian Decl. ¶ 42; Brindis Decl. ¶¶ 16, 23-26; Kost Decl. ¶¶ 92-95, 123. And the Final Rule permits Title X providers to misrepresent a pregnant patient's treatment options by excluding any information about abortion—in other words, presenting the opportunity to hear only about prenatal care and adoption—thus misleading pregnant women into thinking that abortion is *not* a medically appropriate option even when it is. The rule would thus create an unreasonable barrier to care, impede timely access to medical care, and "deny[] patients necessary information to appropriately compare the safety of their medical options," Guttmacher Institute Comment Ltr. 8 (July 31, 2018), thus "violat[ing] the principles of informed consent," 42 U.S.C. § 18114(5).

The Gag Requirement also contravenes "the ethical standards of health care professionals," 42 U.S.C. § 18114(5), by prohibiting Title X projects from providing patients with information about abortion. The AMA's Code of Ethics states that medical professionals must "[p]resent relevant information accurately and sensitively, in keeping with the patient's preferences," and that "withholding information without the patient's knowledge or consent is ethically unacceptable." AMA, Code of Medical Ethics §§ 2.1.1(b), 2.1.3 (2016); *see* AMA Comment 3; *see* PPFA Comment 11; Madara Decl. ¶ 17; Kost Decl. ¶¶ 85, 91; Ewing Decl. ¶ 16;

*see also* Williams Decl. ¶¶ 11-12. It further provides that patients have the right "[t]o receive information from their physicians and to have opportunity to discuss the benefits, risks, and costs of appropriate treatment alternatives." AMA, Code of Medical Ethics Opinion E-1.1.3(b); *accord* AMA Comment 3; Madara Decl. ¶ 18. Rules of ethics that govern other health care professionals are to the same effect.[3]

HHS does not dispute the substance or relevance of these ethical rules. The Final Rule itself acknowledges the critical importance of "open communication" between a Title X patient and her or his health care professional, which "fosters better over-all care for patients." 84 Fed. Reg. at 7,783. HHS further acknowledges that "medical ethics obligations require the medical professional to share full and accurate information with the patient, in response to her specific medical condition and circumstance." *Id.* at 7,724. Yet the Gag Requirement does the opposite—compelling professionals to violate the duties HHS acknowledges by withholding relevant information and misrepresenting patient options. *See, e.g.*, Madara Decl. ¶¶ 10-24; Williams Decl. ¶¶ 11-12; Black Decl. ¶¶ 37-38; Atkinson Decl. ¶ 6; Kost Decl. ¶¶ 26, 108.

    *iii.  HHS's few legal justifications for the Gag Requirement are unavailing.* HHS relies on federal refusal laws, *see, e.g.*, 84 Fed. Reg. at 7,716, but they provide the agency no support. The Coats/Snowe and Weldon Amendments prohibit certain government agencies from "discriminat[ing]" against health care entities that object to abortion. 42 U.S.C. § 238n(a); Pub. L. No. 114-113, Div. H, § 507(d), 129 Stat. 2242, 2649 (2015). The Church Amendment

---

[3]    *See, e.g.*, American Academy of Nursing Comment Ltr. 4 (July 26, 2018) ("[T]he Code of Ethics for Nurses stipulates that patients have the right 'to be given accurate, complete, and understandable information in a manner that facilitates an informed decision.'" (quoting Code of Ethics for Nurses § 1.4)); Association of Women's Health, Obstetric and Neonatal Nurses Comment Ltr. 2 (July 31, 2018) ("[T]he prohibition on abortion referrals contravenes medical ethics[.]").

prohibits public officials from "requir[ing]" individuals or entities "to perform or assist in the performance of … abortion" or discriminating against individuals with religious or moral objections to abortion.  42 U.S.C. § 300a-7.  To the extent any of those provisions have any application at all in the context of Title X, none of them would justify a regulation *prohibiting* Title X projects from referring for abortion.

The government also repeatedly invokes the Supreme Court's decision in *Rust v. Sullivan*.  But that decision cannot save the Final Rule because this case is controlled by a statutory structure that Congress put in place after *Rust*.  *See supra* pp.8-9, 15, 17.  Congress's intent is clear:  All pregnancy counseling under Title X must be nondirective, and HHS may not interfere with full and frank communications between medical provider and patient.

### b.    The Gag Requirement is arbitrary and capricious

The Gag Requirement should also be set aside because it is arbitrary and capricious. HHS failed to consider numerous grave problems that were emphasized in comments on the proposed rule.  *See, e.g.*, *State Farm*, 463 U.S. at 42.

Above all, HHS fails to account for the fact that the Gag Requirement contravenes the ethical and professional commitments of doctors, nurses, and other health care professionals and, as a result, will force Title X providers to withdraw from the program.  *See* PPFA Comment 15-16; NFPRHA Comment Ltr. 4 (July 31, 2018); Custer Decl. ¶ 77.  As Planned Parenthood warned, all of its member affiliates would be forced to exit Title X if the Gag Requirement takes effect.  PPFA Comment 15-16; Custer Decl. ¶ 77.  Among state grantees, Hawaii, Oregon, New York, and Washington, which together serve over 400,000 Title X patients, have also all stated that they would be forced to leave the program.  *See* PPFA Comment 15.  Other providers may well leave the program as well.  *See* Kost Decl. ¶¶ 108-110.

That exodus will have grave public health consequences.  Forcing those providers out of

the program will result in massive disruption and will inevitably hurt patients by making it more difficult for them to obtain affordable, high-quality care.  *See* PPFA Comment 15-16, 33, 55; Brindis Comment Ltr. 3 (July 31, 2018); Kost Decl. ¶ 112.  The providers that would continue to participate in Title X will be unable to absorb all of the patients of those that leave the program. *See* Guttmacher Comment 20; Brindis Decl. ¶¶ 35-37; Kost Decl. ¶¶ 79-80, 109-112.  And even if new Title X providers could somehow fill the gap—which is highly unlikely and supported by nothing in the Final Rule—there would be a harmful and costly disruption in care.  PPFA Comment 15-16; Guttmacher Comment 10; WA, OR, VT, MA AGs Comment Ltr. 24-26 (July 31, 2018); NFPRHA Comment 33.  Moreover, as entities like Planned Parenthood lose Title X funds, they will be forced to close clinics that serve a broad array of patients, including those eligible for Medicaid and others not receiving Title X services.  *See* PPFA Comment 15-17. That reduction in service will impede the ability of non-Title X patients to obtain high-quality reproductive health care.  *See* PPFA Comment 15-20; WA, OR, VT, MA AGs Comment 23-26.

     HHS said virtually nothing about the decimation of the program caused directly by the Gag Requirement—including the consequences of losing a provider, Planned Parenthood, serving approximately 40% of the program.[4]  Rather, ignoring the administrative record, HHS

---

[4]     Indeed, the Final Rule is part of the Trump Administration's longstanding objective to drive Planned Parenthood out of the Title X program.  For example, this Administration's most recent budget, released just four days ago, seeks to bar Planned Parenthood from receiving *any* Title X funds because it "performs … abortions" *outside* the Title X program.  U.S. Gov't, *The Budget for Fiscal Year 2020* 767-768 § 525; *see also, e.g.,* Greenwood, *Trump: Planned Parenthood Cuts Will Come "At the Appropriate Time,"* The Hill, May 2, 2017; Haberman, *Trump Tells Planned Parenthood Its Funding Can Stay If Abortion Goes*, N.Y. Times, Mar. 6, 2017; Paquette, *Donald Trump's Incredibly Bizarre Relationship with Planned Parenthood*, Wash. Post., Mar 2, 2016; Senator Patty Murray Ltr. to U.S. Senate Committee on Health, Education, Labor, and Pensions, at 2 (July 5, 2018) (describing efforts of defendant Dr. Foley "to spread misinformation, undermine women's access to basic health care services, and roll back

asserted its belief that "these final rules will contribute to more clients being served, gaps in service being closed, and improved client care." 84 Fed. Reg. at 7,723.  That claim is not only "counter to the evidence before the agency" but is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *State Farm*, 463 U.S. at 43.[5]

HHS also failed to engage in any serious analysis of the impact of the Final Rule on patients and their health care.  For example, if Title X providers are barred from providing referrals for abortion or are permitted to provide counseling that steers patients away from abortion, patients who want or need to terminate their pregnancy will face delays and disruptions in care and a resulting increased risk of complications from an abortion, *see* PPFA Comment 14, 20-21; Kost Decl. ¶¶ 73, 123, as well as an increased risk that the pregnancy will cause or exacerbate other medical conditions, *see* EAH Comment Ltr. 4 (July 30, 2018); Brindis Decl. ¶¶ 22-25.  Some patients may be deterred or prevented from obtaining an abortion altogether, which can jeopardize a woman's health, including by "obstructing pregnant patients with complicating medical conditions from obtaining potentially life-saving abortions."  Guttmacher Comment 8.

HHS ignored these health costs and risks and instead simply assumed away the problem, declaring "[i]nformation about abortion and abortion providers is widely available and easily accessible, including on the internet." 84 Fed. Reg. at 7,746.  That is an astonishing conclusion for an agency charged with implementing a program specifically designed to reach patients with limited means and to educate them about their options.  As the comments explained, many

---

women's reproductive rights"); Memo. to Sen. Murray Ltr. 3 (July 5, 2018) (detailing examples where Dr. Foley has demonstrated she "is vehemently anti-abortion").

[5]     HHS relied on only one single letter as supposed evidence of the existence of providers, specifically "faith-based medical professionals," that might be able to fill gaps in services.  *See* 84 Fed. Reg. at 7,780.  And not even that one letter supports HHS's position.  *See, e.g.*, Kost Decl. ¶ 79.

patients of limited means have "low 'health literacy,' meaning the knowledge and ability to

navigate the health care system," and "[s]ome patients also lack regular access to

communications tools (*e.g.*, internet, phone) that are needed to access and research information

on their own." Ryan Health Comment Ltr. 3 (July 31, 2018).

HHS stated that it was "not aware, either from its own sources or from commenters, of

actual data that could demonstrate a causal connection between the type of changes to Title X

regulations contemplated in this rulemaking and an increase in unintended pregnancies, births, or

costs associated with either." 84 Fed. Reg. at 7,775. That statement, again, ignores the record.

The likely consequences, based on prior experience, were detailed in comments on the proposed

rule. *See, e.g.*, Brindis Comment 6-7, 12; Brindis Decl. ¶¶ 31, 47; Kost Decl. ¶¶ 119-122

For example, one expert commenter (and a declarant here) detailed that, when Planned

Parenthood was forced to close a clinic in rural Indiana due to cuts to public-health funding,

there was a huge spike in the spread of HIV in the area. Brindis Comment 6-7. Similarly, when

the State of Texas cut back family-planning funding and denied funds to Planned Parenthood,

there was "a 35% decline in women using the most effective methods of family planning and a

27% increase in births among women who had been using … injectable contraceptive methods

prior to Texas's restrictions." Brindis Comment 12. Evidence before the agency also showed

that, in 2010, the $2.2 billion in public funds spent on family planning and related sexual and

reproductive health services were estimated to have averted approximately 2.2 million

unintended pregnancies as well as other adverse health outcomes. *Id.* at 12. The estimated

public costs associated with those unintended pregnancies, had they not been averted, would

have been $15.8 billion—virtually all of which ($15.2 billion) would be "attributable to publicly

covered maternity and child health care." *Id.* at 12-13; *see also, e.g.*, PPFA Comment 19.

The Gag Requirement also flouts the agency's own evidence-based clinical recommendations.  *See* AMA Comment 3; PPFA Comment 13; ACOG Comment Ltr. 8 (July 31, 2018); NFPRHA Comment 6; Ewing Decl. ¶ 32; Megregian Decl. ¶ 30; Kost Decl. ¶¶ 22-28, 73, 85.  Guidelines issued by HHS and the CDC in 2014 state that when a health care provider tells a patient that she is pregnant, the provider should provide "[o]ptions counseling … in accordance with the recommendations from professional medical associations, such as ACOG and AAP," and discuss "appropriate referrals" with the patient.  CDC, *Providing Quality Family Planning Services* 14 (2014).  The process of developing the agency's recommendations was rigorous and based on the effectiveness of services.  *See id.* at 3.  It constitutes a body of objective, research-based practices that HHS cannot ignore.  "An agency conclusion that is in 'direct conflict with the conclusion of its own experts' … is arbitrary and capricious."  *Natural Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016).

At bottom, HHS's failure to account for the numerous problems and costs identified by the commenters underscores yet another flaw with the Final Rule:  It is the product of Defendants' prejudgment and "unalterably closed mind," not a process intended to solicit and incorporate feedback from interested parties.  *See Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1467 (9th Cir. 1987); *Habeas Corpus Res. Ctr. v. DOJ*, 2009 WL 185423, at *9 (N.D. Cal. Jan. 20, 2009); *supra* pp.10, 21 n.4; *infra* p.40.

> **2.**    **The Gag Requirement's Speaker-Based Ban On Who Can Provide Pregnancy Counseling Is Unlawful**

In addition to its restrictions on the *content* of information that Title X providers may provide their patients, the Final Rule imposes a *speaker-based* ban on *who* may provide "pregnancy counseling" on abortion or otherwise.  Only "physicians or advanced practice providers" may provide such counseling.  84 Fed. Reg. at 7,787, 7,789 (to be codified at 42

C.F.R. § 59.2, 59.14(b)(1)(i)).  APPs are defined, by the Final Rule, as medical professionals

who have "at least a graduate level degree in the relevant medical field and maintain[] a license

to diagnose, treat, and counsel patients." *Id.*  This speaker-based ban must be set aside because it

was promulgated without notice and comment, as the APA requires.  It is also contrary to federal

law and arbitrary and capricious.

a.      **The speaker-based ban was promulgated without proper procedure**

The APA requires an agency to provide the public with notice and an opportunity to

comment before promulgating a rule.  5 U.S.C. § 553(b)-(c).  Although a final rule issued by the

agency "need not be identical" to that proposed in the notice, the final rule "must be a logical

outgrowth of the proposed rule" so that "interested parties reasonably could have anticipated the

final rulemaking." *Natural Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002).  A

final rule is a logical outgrowth of a proposed rule if the agency "expressly ask[s] for comments

on a particular issue or otherwise ma[kes] clear that the agency [is] contemplating a particular

change." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009).

Nowhere in the proposal did HHS ask for comments on whether practitioners other than

physicians or APPs should be prohibited from counseling patients on their "pregnancy" options.

Nor did HHS suggest that it was contemplating limiting pregnancy counseling to providers with

any particular qualifications.  The agency's newly issued restriction was therefore not a logical

outgrowth of the proposed rule.  *See CSX Transp.*, 584 F.3d at 1082; *Natural Res. Def. Council*,

279 F.3d at 1187-1188.  Moreover, had they known that HHS was considering such a restriction,

commenters would have made clear that the ban is contrary to longstanding medical practice and

would have significant negative consequences for patients.  Those consequences include delays

and disruptions in care for patients, unnecessary burdens on doctors and APPs, and increased

costs for providers.  *See, e.g.*, Kost Decl. ¶ 86; Gardner Decl. ¶¶ 46-48; Atkinson Decl. ¶¶ 45-46;

Black Decl. ¶ 41; Madara Decl. ¶ 28; *infra* p.28.  Because the public had no opportunity to

comment on the agency's new speaker-based ban, it should be set aside.  *See* 5 U.S.C.

§ 706(2)(D).[6]

> **b.    The speaker-based ban is contrary to federal law**

The speaker-based ban also violates 42 U.S.C. § 18114 by imposing an unreasonable

barrier to a patient's ability to access health care.  Medical staff without advanced degrees—such

as registered nurses, nurse assistants, and health care assistants—routinely deliver critical Title X

care, including nondirective pregnancy counseling.  PPFA Comment at 14-15; American

Academy of Nursing Comment 3; Gardner Decl. ¶¶ 46-48; Atkinson Decl. ¶ 15; Black Decl. ¶¶

31-32; Kost Decl. ¶ 86.  HHS itself has recognized the important role that practitioners without

graduate degrees play in providing family planning care, including by providing "client

education, counseling, [and] referral" to Title X patients.  Office of Population Affairs, *Title X*

*Family Planning Annual Report: 2017 National Summary*, at 4 (August 2018) ("*Title X Annual*

*Report*").  As just discussed, restricting which health care professionals may counsel pregnant

patients would raise the cost of providing such care, reduce the number of patients with those

needs who could be served, and create delays and disruptions in care.  *See also infra* p.28.  Thus,

because it increases costs, reduces access, and produces delays, the staffing restriction "creates

… [an] unreasonable barrier[] to [patients'] ability … to obtain appropriate medical care" and

---

[6]    At most, the proposed rule vaguely suggested that HHS was considering prohibiting any
Title X project from providing nondirective counseling *on abortion*, with a possible exception
for doctors.  *See* 83 Fed. Reg. at 25,507, 25,518; *but see id.* at 25,530 (proposed § 59.5(a)(5))
(containing no exception to the prohibition on "present[ing] abortion").  But it nowhere hinted
that HHS might restrict who would be allowed to provide "pregnancy counseling."  Moreover,
the proposed rule's repeated reference to changes regarding nondirective counseling *on abortion*
implied that HHS would not restrict the provision of other pregnancy counseling.

"impedes timely access to health care services." 42 U.S.C. § 18114(1), (2).

### c.    The speaker-based ban is arbitrary and capricious

The speaker-based ban also lacks any justification—which is not surprising since the agency did not mention it in the proposed rule. HHS imposed this restriction with no discussion of how or why it drew the line between those who may counsel patients on pregnancy options and those who may not. That alone dooms the rule. *See, e.g.*, *State Farm*, 463 U.S. at 43.

Moreover, this ban "runs counter to the evidence before the agency," and HHS has "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. The record before the agency shows that non-APPs "were involved with 1.7 million Title X family planning encounters in 2016"—more than a quarter of all family-planning encounters in that year. 84 Fed. Reg. at 7,778. And, as already mentioned, HHS has recognized that those health care professionals provide essential client education and counseling. *Title X Annual Report* 4. Yet HHS did not consider the substantial costs associated with requiring that all pregnancy counseling now be provided by physicians or APPs, or the negative effects such a ban would have on a Title X project's ability to provide timely counseling to pregnant women. Many providers, including Planned Parenthood, rely on skilled non-APPs to provide the majority of nondirective pregnancy counseling to patients under Title X. *See* Atkinson Decl. ¶ 35; Black Decl. ¶ 31; Gardner Decl. ¶¶ 46-48; Madara Decl. ¶ 28. If HHS's restriction takes effect, patients will face delays and disruptions in care, resulting in worse health outcomes. *See, e.g.*, Atkinson Decl. ¶ 45. Yet, as the record shows, "time is of the essence for pregnant patients" who must often choose whether to continue or terminate a pregnancy in a short window of time. National Health Law Program Comment Ltr. 9 (July 31, 2018).

This restriction is also contrary to best medical practices. According to a study supported by HHS, when doctors, nurses, and staff work at the "top of their license," meaning they work to

the full extent of their education and training, health outcomes improve and health centers are able to see almost double the number of patients.  *See, e.g.*, Goldberg et al., *Team Based Care: A Critical Element of Primary Care Practice Transformation*, 16 Pop. Health Mgmt. 3, 153 (2013). Requiring doctors and APPs to provide all pregnancy counseling, however, requires those professionals to perform duties that other health care professionals could undertake—imposing unjustified costs and consequences on patients, providers, and practitioners.  *See, e.g.*, Ewing Decl. ¶¶ 48-50; Megregian Decl. ¶ 48; Gardner Decl. ¶ 47.

The speaker-based ban appears designed, in conjunction with the rest of the Gag Requirement, to suppress truly nondirective pregnancy counseling—in particular, counseling that includes informing pregnant women about *all* their options, including the option of abortion under Title X.  This ban would thus require unworkable, unnecessary, and harmful shifts in the Title X program, to the detriment of providers and patients.

### 3.    The Gag Requirement Is Unconstitutional

The First Amendment protects both Plaintiffs' right to communicate with their patients and their patients' right to hear from their providers about their medical options, including the option for an abortion where that is consistent with the patient's wishes or medical needs.  HHS, however, would unconstitutionally impose content- and viewpoint-based restrictions, compel speech, and even ban an entire category of medical professionals from speaking at all.

Plaintiffs recognize that *Rust* rejected a First Amendment challenge to a prior version of the Gag Requirement, but that decision was wrongly decided.  Moreover, as described below, *Rust* has been undermined by nearly 30 years of experience with the Title X program and recent Supreme Court precedent confirming that medical speech is deserving of First Amendment protection of the highest order.  But Plaintiffs also recognize the Supreme Court's repeated admonition that lower courts must leave to the Supreme Court "'the prerogative of overruling its

own decisions.'" *Tenet v. Doe*, 544 U.S. 1, 11 (2005); *United States v. Ye*, 808 F.3d 395, 399 n.2 (9th Cir. 2015).

Just last year, the Supreme Court struck down a law that required certain clinics primarily serving pregnant women to "provide a government-drafted script about the availability of state-sponsored services, as well as contact information for how to obtain them." *NIFLA*, 138 S. Ct. at 2371. The Supreme Court rejected the argument that restrictions on "professional speech"— including that of medical professionals and others—receive a reduced degree of First Amendment protection. To the contrary, the Court emphasized, "[d]octors help patients make deeply personal decisions, and their candor is crucial. *Id.* at 2374. Moreover, the Court warned: "Throughout history, governments have 'manipulat[ed] the content of doctor-patient discourse' to increase state power and suppress minorities[.]'" *Id.* (quoting Berg, *Toward a First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B. U. L. Rev. 201, 201-202 (1994)).

The Final Rule is designed to "'manipulate[] the content of doctor-patient discourse.'" *NIFLA*, 138 S. Ct. at 2374. Moreover, it is content-based, targeting and banning abortion referrals. *See id.* at 2371 ("Content-based regulations 'target speech based on its communicative content.'"). Indeed, it is "a paradigmatic example" of a *viewpoint*-based regulation because it "seeks to impose its own message in the place of individual speech, thought, and expression." *Id.* at 2379 (Kennedy, J., concurring). Its prohibitions and mandates disfavor speech about one medical option over the other—against abortion and in favor of continuing a pregnancy to term.

Moreover, the Final Rule compels speech from medical professionals in several ways, even when it is against their professional or ethical obligations and contrary to their patient's wishes. It *mandates* that medical professionals provide prenatal referrals. And even when a

pregnant patient says she is only interested in abortion, it further *mandates* that professionals speak about other options she does not want and *mandates* that they tell her about the "risks and side effects to both [her] and unborn child." 84 Fed. Reg. at 7,747; *see Janus v. American Fed'n of State, Cty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018) ("When speech is compelled … additional damage is done."). For all these reasons, the Final Rule is "'presumptively unconstitutional,'" *NIFLA*, 138 S. Ct. at 2371, and comes nowhere near identifying any compelling state interest or narrow tailoring, *see supra* pp.20-24.

The majority in *Rust* acknowledged that the constitutional challenges to the 1988 rule were "not … without some force." 500 U.S. at 191. And it further recognized that "[i]t could be argued … that traditional relationships such as that between doctor and patient should enjoy protection under the First Amendment from Government regulation, even when subsidized by the Government." *Id.* at 200. But it reserved that question for two reasons. First, the Court concluded, nothing in the 1988 rules "require[d] a doctor to represent as his own any opinion that he does not in fact hold." *Id.* Second, "the doctor-patient relationship established by the Title X program" was not "sufficiently all encompassing so as to justify an expectation on the part of the patient of comprehensive medical advice." *Id.*

That question is ripe for revisiting by the Supreme Court, and both of those conclusions are infirm. The former is inconsistent with *NIFLA*. And the latter "misunderstood the dynamics of doctor-patient interaction, and as a result, … the danger that patients will be coerced and confused by government messages delivered by physicians." Berg, 74 B.U. L. Rev. at 206, *cited in NIFLA*, 138 S. Ct. at 2374. *Rust* also failed to appreciate that restrictions on the provider-patient discourse infringe *two* First Amendment rights—not only that of medical professionals to speak, but also a patient's right to receive information they need to make personal choices about

their medical treatment.  *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) ("freedom of speech 'necessarily protects the right to receive'").[7]

Finally, the Gag Requirement also imposes a speaker-based ban, one not at issue in *Rust*. The Supreme Court's precedents, *NIFLA* recently reaffirmed, "are deeply skeptical of laws that 'distinguis[h] among different speakers, allowing speech by some but not others.'"  138 S. Ct. at 2378.  "Speaker-based laws," *NIFLA* further warned, "run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'"  *Id.*  Here, without hint of explanation, HHS would ban all non-APPs from providing nondirective counseling on abortion and other pregnancy options.  As discussed, the apparent purpose of this ban is to ensure that nondirective pregnancy counseling—specifically, counseling on abortion— is essentially unavailable.  *Cf. id.* at 2378 (striking down "the 'detail required' by the unlicensed notice 'effectively rules out' the possibility of having such a billboard in the first place").

## 4.    The Separation Requirement Is Unlawful

Through its second central provision, the Separation Requirement, the Final Rule imposes onerous and vague "physical and financial" separation requirements on Title X providers that engage in so-called "prohibited activities."  Those "prohibited activities" include not only the provision of abortion with non-Title X funds, but also abortion referrals, anything

---

[7]    Moreover, *Rust*, as interpreted by later cases, turned on the conclusion that the Title X program was merely a vehicle for government speech.  *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995).  That conclusion is also infirm.  *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 554 (2001) (Scalia, J., dissenting) ("If the private doctors' confidential advice to their patients at issue in *Rust* constituted 'government speech,' it is hard to imagine what subsidized speech would *not* be government speech.").  Title X's purpose is to facilitate access to comprehensive family-planning services for all who desire them.  If that were in doubt, Congress's enactments post *Rust* confirm that Title X is *patient* centered and *patient* driven, where open and candid nondirective communication is the vital operating principle.

that otherwise encourages, promotes, or advocates for abortion—and going so far as to reach abortion-related brochures sitting on table.  *See supra* pp.13-14.

Under the Final Rule, Title X providers who engage in such "prohibited activities" must comply with new and sweeping requirements—in form and effect, complete and unnecessary duplication of facilities, personnel, and records systems.  In particular, they must "physically" separate their Title X projects from those "prohibited activities," including by creating "separat[e] … facilities," "separate personnel … and workstations," and "separate … health care records," 84 Fed. Reg. at 7,789.  And the Final Rule emphasizes that *all* of those elements are required, and even that might still be insufficient under the vague, discretionary standard resting with the HHS Secretary.  *See, e.g.*, *id.* at 7,725 ("preclude shared physical space and staff").  The Separation Requirement would harm patient care and impose large and unnecessary costs on Title X providers, if compliance is even possible.  It is contrary to federal law and arbitrary and capricious.

### a.    The Separation Requirement is contrary to federal law

The Separation Requirement contravenes 42 U.S.C. § 18114.  As explained above, that provision—enacted as part of the Affordable Care Act to ensure that HHS would not impose unjustified barriers to care or burden the provider-patient relationship—prohibits HHS from promulgating "any regulation" that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "impedes timely access to health care services," or "limits the availability of health care treatment for the full duration of a patient's medical needs."  *Id.* § 18114(1), (3), (6).  The Separation Requirement, however, will have exactly those forbidden effects.

First, the Separation Requirement will force many Title X providers out of the program. As a direct result, their patients will suffer grave health care consequences—precisely the

consequences that § 18114 was enacted to prevent.

As the record shows, the Separation Requirement will force many Title X providers who engage in *any* abortion-related activities even with separate funds *outside* the Title X program—including referrals for abortion—to leave the Title X program because the Final Rule's Separation Requirement is unworkable and cost-prohibitive.  *See* PPFA Comment 33; Guttmacher Comment 9; Atkinson Decl. ¶ 7; Black Decl. ¶ 6; Udall Decl. ¶¶ 42-49; Gardner Decl. ¶¶ 51-57; Madara Decl. ¶¶ 38, 41; Kost Decl. ¶¶ 102-108.  Title X grantees that currently provide Title X services and also offer referrals for abortion and abortion services with non-federal funds in the same physical facility will be required to alter those facilities to create separate "treatment, consultation, examination and waiting rooms" and "office entrances and exits," 84 Fed. Reg. at 7,789 (to be codified at 42 C.F.R. § 59.15(b))—at an estimated cost exceeding $536,000 per facility.  PPFA Comment 32.  Grantees that cannot complete such renovations—either because they lease facilities and are not permitted to make extensive structural renovations or because their facilities are not large enough to support two separate operations—will be forced out of the program unless they can obtain new facilities, at an estimated cost exceeding $1 million each, a cost that is out of reach for many grantees.  *Id.* at 32-33.  Title X grantees that engage in abortion-related activities outside the program will also be required to incur significant costs to establish and maintain separate health records systems, telephone systems, information technology systems, educational services, and websites.  They will also be required to hire separate personnel.  *See* PPFA Comment 32-33; *see also* AMA Comment 4; NY State Department of Health Comment Ltr. 18-19 (July 30, 2018).

It is not feasible for non-profit Title X grantees to sustain such enormous costs.  For many grantees, the cost of compliance will far exceed the amount of Title X funding they

receive. For example, Planned Parenthood South Atlantic ("PPSAT")—serving North Carolina, South Carolina, western Virginia, and West Virginia—receives $2.9 million per year in Title X funding, but obtaining new facilities to comply with the separation requirements would cost nearly $6 million. Black Decl. ¶ 55; *see also, e.g.*, Gardner Decl. ¶¶ 51, 57; Udall Decl. ¶¶ 42, 48. As a result of those unjustified costs, Title X providers will be forced to leave the program.

And it will be their patients—above all—who will suffer. Those providers' patients will have to look elsewhere for care, but as the record shows many of them will not find a place to obtain it. Many of Planned Parenthood's health centers, for example, are located in areas where patients have limited access to other reproductive health care providers. *See* PPFA Comment 33; Atkinson Decl. ¶¶ 19-21; Black Decl. ¶¶ 18-20. Moreover, other Title X projects, which are already overburdened, cannot realistically be expected to absorb the Title X caseload of those grantees that would leave the program. Guttmacher Comment 9-10. Other Title X sites would have to increase their client caseloads by *70%*, on average, to serve all of the women who obtain contraceptive care at Title X-supported Planned Parenthood health centers. *Id.* at 10.

For all these reasons, the Separation Requirement would necessarily cause serious delays and disruption in patient care. *See, e.g.*, Guttmacher Comment 9-10. Many patients will likely lose access to health care altogether. *See id.*; Kost Decl. ¶¶ 106-117. That is exactly what § 18114 proscribes. *See* 42 U.S.C. § 18114(1), (3), (6).

Even for those Title X providers who remain within the program, the Separation Requirement will have grave consequences. Those providers may simply abandon all of the so-called "prohibited activities" that trigger the Separation Requirement so that they can continue to receive Title X funds without incurring the cost-prohibitive expenses the Separation Requirement would otherwise impose. These "prohibited activities," again, include offering

abortion referrals or providing abortions with *non*-Title X funds.  As a result, the Separation

Requirement will deprive patients of information about abortion and access to abortion—and

will thus create an unreasonable barrier to medical care and interfere with patient-provider

communications regarding treatment options.  *See* 42 U.S.C. § 18114(1)-(4).  Moreover, these

consequences will unreasonably disrupt care not just for patients who rely on Title X for free or

subsidized care, but for *all* patients served by affected facilities—limiting the patients'

information and ability to make informed decisions about their medical care, and impeding or

delaying their ability to obtain an abortion.  *See supra* pp. 18, 21.

    In defense, HHS contends that the Separation Requirement is required by Section 1008.

*See* 84 Fed. Reg. at 7,764.  That is incorrect.  Section 1008 prohibits only the use of Title X

"funds … in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.  It

does not require that Title X projects be *physically* separated from programs where abortion is

offered, so long as the grantee ensures that Title X funds are not used in such programs.  *See* 65

Fed. Reg. at 41,276 ("[T]he statute does not on its face require physical separation; rather, by its

terms it is addressed to the use of 'funds.'").  Moreover, integration of Title X projects with other

reproductive health services is consistent with Congress's goal of making effective family-

planning services widely available to low-income communities.  *See* H. R. Rep. No. 91-1472, at

4 (1970) (Title X was intended "to assure the coordination … of domestic family planning

services").  And HHS has provided grants to projects located in the same physical facility as

abortion-services providers—including many Planned Parenthood affiliates—since Title X's

inception.  *See, e.g.*, Gardner Decl. ¶¶ 35, 50.  Congress has long been aware that the placement

of Title X projects within larger reproductive health centers could, and often did, result in the

Title X services being offered in the same physical facility as other services, including abortion-

related services.  *See, e.g.*, 124 Cong. Rec. 37,046 (1978).  Nonetheless, Congress has never

acted to require physical separation, and rejected a 1978 proposal that would have had similar

effects to the rule proposed here.  *Id.* at 37,045-37,046.

Finally, although the Supreme Court held in *Rust* that a similar separation requirement

was a permissible means of enforcing the statutory prohibition against using Title X funds for

abortions, *see* 500 U.S. at 189-191, that conclusion does not govern here given Congress's

subsequent prohibition, in the Affordable Care Act, of any HHS regulations that would create

unreasonable barriers or impair access to care.  HHS is obligated to ensure that its

implementation of Section 1008 does not create an "unreasonable barrier[] to the ability of

individuals to obtain appropriate medical care" or "impede[] timely access to health care

services," 42 U.S.C. § 18114(1)-(2).  *See, e.g.*, *Pritzker*, 828 F.3d at 1139 (agency action must

not be "inconsistent with a statutory mandate or … frustrate the congressional policy underlying

a statute"); *Cactus Corner, LLC v. U.S. Dep't of Agric.*, 346 F. Supp. 2d 1075, 1111 (E.D. Cal.

2004) (agencies must act in line with "the overall structure of the authoritative statutes and

regulations").  The Final Rule fails to satisfy those statutory obligations.

### b.    The Separation Requirement is arbitrary and capricious

The Separation Requirement should also be set aside because it lacks any support in the

administrative record and HHS fails to account for the serious reliance interests at stake.

First, HHS nowhere meaningfully explains why the current regulations are inadequate,

and—as the record plainly shows—they are not.  For decades, those regulations have ensured

that Title X funds are not used to provide abortions, and Title X providers have long relied on

them and complied with them.  Longstanding HHS regulations make clear that Title X funds

may be used "solely for the purpose for which the funds were granted in accordance with …

applicable cost principles," 42 C.F.R. § 59.9, and may not be used to "provide abortions," *id.*

§ 59.5(a)(5).  Moreover, the current regulations have long required that Title X providers ensure that "[n]on-Title X abortion activities … be separate and distinct from Title X project activities." 65 Fed. Reg. at 41,282.  And Title X grantees are already subject to audit and financial risk assessment, among other things.  *See, e.g.*, Black Decl. ¶ 36; Atkinson Decl. ¶ 39.

Indeed, the Final Rule cites *no* evidence of misuse of funds over the past *half-century*— underscoring the effectiveness of the regulations the agency now seeks to displace.  Instead of evidence, HHS invoked "risk[s]" of "appearance[s]," "perceptions,"  and "potential" misuse of funds, 84 Fed. Reg. at 7,764-7,765, without pointing to anything to suggest those risks or perceptions are anything more than speculation.  In short, HHS devised the Separation Requirement as a solution in search of a nonexistent problem.  That does not suffice for reasoned decision-making.  *See Natural Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 210 (D.C. Cir. 1988); *National Fed'n of Indep. Bus. v. Perez*, 2016 WL 3766121, at *29 (N.D. Tex. June 27, 2016) (granting preliminary injunction where agency "has not offered any evidence showing a new alleged need for its dramatically changed rule").

Second, the Final Rule failed to take into account the "serious reliance interests" engendered by the prior policy that HHS now seeks to radically change.  *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016); *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 515 (2009) (when a prior policy "has engendered serious reliance interests," an agency "must" "provide a more detailed justification than what would suffice for a new policy created on a blank slate").  As explained below, the Final Rule fails to account for the drastic costs of this new policy.  But at a more fundamental level, the Final Rule fails to acknowledge that Title X providers have structured their programs in accordance with the current regulations *for decades*.  Thus, relying on HHS's settled interpretation of Title X, Title X providers have, for

example, purchased or leased land, built health centers, hired and trained personnel, and purchased and maintained health records systems—knowing that shared facilities, records systems, and personnel are all expressly authorized by HHS. *See, e.g.*, Gardner Decl. ¶¶ 4, 50-58; Kost Decl. ¶¶ 102-103.

Third, HHS has failed to account properly for the costs the Separation Requirement would impose. HHS drastically underestimates the financial costs of the rule. HHS estimated that affected grantees will incur average costs of $30,000, 84 Fed. Reg. at 7,782, but HHS provides no support for its cost estimate. And the evidence before the agency shows that this unexplained number is nowhere close to the actual cost of compliance: Planned Parenthood estimated average capital costs of nearly *$625,000* per affected service site. PPFA Comment 32; *see also* NFPRHA Comment 37. That estimate was based on actual renovation and construction cost estimates in a report produced by a federally funded non-profit organization that works with community health centers and on Planned Parenthood's experience acquiring commercial property. *See* PPFA Comment 31-32.

Furthermore, HHS fails to account for ongoing (not just one-time) costs, including those associated with required duplication of staff and contracts for goods and services—costs that can reach millions of dollars for some grantees. *See* PPFA Comment 32-33; Black Decl. ¶¶ 52-53; Udall Decl. ¶¶ 45. Those costs will be exacerbated by the fact that the Separation Requirement is both broad and vague, *see supra* p.13, and thus non-profit health providers with scarce resources will be compelled to over-comply to avoid being found in violation. *See* ACLU Comment 9; PPFA Comment 34-35. HHS also underestimates the number of Title X service sites that will be affected by the Separation Requirement. HHS estimates that only 20% of Title X service sites share resources with non-Title X projects that "offer abortion as a method of

family planning." 84 Fed. Reg. at 7,781. But HHS apparently disregards that the Separation Requirement's "prohibited activities" are defined by cross-reference to the Gag Requirement and thus would also require separation from projects that *speak* about abortion—for example, by providing abortion referrals or even placing abortion-related pamphlets on an office table. HHS's arbitrary cost estimate and disregard of the "relevant data" demonstrates that the Separation Requirement was not "the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52.

Fourth, HHS also has "entirely failed to consider" the harms to public health caused by the Separation Requirement. *State Farm*, 463 U.S. at 43. As commenters explained, this requirement will result in many health care providers being forced to discontinue their participation in Title X because it is cost-prohibitive for them to physically separate the Title X project from other activities. *See* PPFA Comment 33; NFPRHA Comment 37. The departure of a large number of Title X-funded providers would reduce access to family-planning care and would lead to adverse effects on the health of both Title X and non-Title X patients. *See supra* pp.21-35; PPFA Comment 15-20, 33; AMA Comment 4; Custer Decl. ¶¶ 96, 113, 121.

And even if some Title X grantees are able to physically separate their programs, patients will still suffer from uncoordinated care. *See* PPFA Comment 33-34; Custer Decl. ¶ 89. For example, studies show that the required separation of health-records systems would pose a "risk to patient safety." PPFA Comment 34. Using multiple health records systems increases the risk of missing data, including information about allergies or drug interactions and past medical history or family history. *See, e.g.*, Custer Decl. ¶ 89. HHS claims that "because of growing interoperability of [electronic health record systems] and other health IT, it is a simpler matter for one provider to share a patient's [electronic health record] with another provider."

Reg. at 7,767.  But a patient is unlikely to understand that when she visits a particular provider's Title X project, the notes from her visit will not be accessible at the same provider's other facility that may provide abortions or abortion referrals, and so the patient is unlikely to request that the health record be shared in the first place.

Finally, as with the Gag Requirement, HHS's failure to account for the numerous problems and costs identified by the commenters illustrates again that the Final Rule is the product of Defendants' prejudgment.  *See supra* pp.10, 24 n.4.  Indeed, it underscores that President Trump meant precisely what he said when he offered that his "administration has proposed a new rule to prohibit Title 10 funding from going to any clinic that performs abortions."  *Remarks by President Trump at the Susan B. Anthony List 11th Annual Campaign for Life Gala*, White House.gov (May 22, 2018).  This rulemaking has never been about so-called "program integrity" or fixing any actual problem with Title X.  Rather, the clear purpose and effect are to ban from the Title X program those providers who provide abortions with *non*-Title X funds.

### B.    Plaintiffs And Patients Will Suffer Irreparable Harm Absent An Injunction

If it is not enjoined, the Final Rule will cause grave and irreparable injuries to Plaintiffs, their members and affiliates, and—above all—their patients.  Title X providers will have to close health centers, shorten hours, and lay off critical staff.  Many patients will lose access to care, or at a minimum face delays and disruptions in care.  And they will lose trust in their providers and the medical system as a whole.  These harms will be widespread, but they will fall hardest on those who already face the biggest barriers to care—low-income individuals, patients in rural areas, and communities of color.

### 1.    Loss Of Providers, Health Center Closures, And Cut Services

If the Final Rule is allowed to go into effect, all Planned Parenthood affiliates, numerous

States, and other providers will be forced to leave the program rather than comply with the Gag Requirement's unethical requirements. *See supra* p.20. Moreover, providers will be forced to divert precious resources to complying with the Separation Requirement—where compliance is even possible, which will not be the case for many Title X projects—at great cost to providers and patients. *See, e.g.*, Custer Decl. ¶ 87; Kost Decl. ¶ 76.

Thus, as a direct result of the Final Rule, Planned Parenthood affiliates will have to close health centers or reduce services and lay off clinicians and staff. Gardner Decl. ¶¶ 61-62; Udall Decl. ¶¶ 51-52; Atkinson Decl. ¶ 60; Black Decl. ¶¶ 56-57. Planned Parenthood of Wisconsin ("PPWI"), for example, anticipates that it would lose approximately $3.5 million in Title X funding, and that it would have to close up to four health centers in rural areas and two locations in Milwaukee, which receive between 25% and 70% of their budget from Title X. Atkinson Decl. ¶¶ 59-60. Those health centers collectively serve an estimated 25,000 patients. *Id.* ¶ 62. Those closures will leave thousands of patients (including both Title X patients and non-Title X patients) with few or no options for high-quality reproductive care. *Id.* ¶ 63. As another example, PPSAT would lose up to $2.9 million in Title X funding and would likely have to close four health centers (which receive between 22% and 63% of their revenue from Title X) and lay off up to four clinicians and approximately 20 other staff. Black Decl. ¶¶ 34, 56-57. Together, these health centers serve more than 7,000 patients annually. *Id.* ¶ 57.

This massive disruption in the provision of health care—resulting in closures, layoffs, and service cutbacks—establishes irreparable harm. *See, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1105 (N.D. Cal. 2017). Plaintiffs will also be irreparably harmed by the loss of patients and goodwill that would result if Planned Parenthood has to turn away patients because of closures, service reductions, or a lack of funds to subsidize care for those who cannot

afford it.  *See, e.g.*, *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986).

Such harms cannot be remedied even if the Final Rule is enjoined at the end of litigation. Lost Title X funds cannot be recouped from the federal government.  *See* 5 U.S.C. § 702. Moreover, laid off staff and clinicians cannot be easily re-hired; health centers that are closed cannot be easily re-opened; patients who are turned away cannot be re-gained, and the lost trust of patients for whom Plaintiffs are unable to provide reliable care cannot be restored.  *See* Custer Decl. ¶¶ 72, 110; Black Decl. ¶ 63.  If Planned Parenthood affiliates lose Title X funding, they will have to sell facilities, break leases, and abandon contracts, *see, e.g.*, Custer Decl. ¶ 110— which constitute irreparable harm, *see, e.g.*, *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009); *Pomerantz ex rel. NLRB. v. International Longshore & Warehouse Union, Local 4*, 2013 WL 5651624, at *8-9 (D. Or. Oct. 15, 2013).

All of these harms are "*likely*, not just possible."  *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Experience shows that the loss of millions of dollars in Title X funding would require widespread closures and service cuts.  For example, in 2011, the Wisconsin legislature cut PPWI's funding by $1 million, and that affiliate was forced to close five health centers in underserved rural communities, beginning just months after the cuts took effect.  Atkinson Decl. ¶ 74.  Similar harms would befall many other Planned Parenthood affiliates if the Final Rule is implemented.  *See* Custer Decl. ¶¶ 91, 110, 122.

## 2.    Harm To The Provider-Patient Relationship

In addition, Plaintiffs' reputations as reliable providers of high-quality medical care will be tarnished if the Final Rule is allowed to take effect.  As explained, the Final Rule will force providers to choose between violating their ethical responsibilities and leaving the Title X program.  Those who remain would be compelled to withhold information from their patients— information patients seek and need to make an informed decision about their care.

The Final Rule would in turn cause patients to lose trust in their providers and the medical system as a whole.  *See* Ewing Decl. ¶¶ 41-44; Megregian Decl. ¶¶ 38-39.  Patients expect their providers to deliver high-quality comprehensive care at every visit, whether or not it is being funded by Title X.  If providers cannot do that consistently, they will no longer be able to earn or keep their patients' trust for any type of visit.  *See* Custer Decl. ¶¶ 72, 76.  That threatened loss of patient trust warrants injunctive relief.  *See, e.g.*, *Stuhlbarg Int'l Sales Co., v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001).

### 3.    Harm To Patients And Public Health

Finally—and most important—the Final Rule will have devastating consequences on patients.  The rule would impose limits on the counseling and referrals that reproductive care providers give to pregnant patients who seek their care every day.  Ewing Decl. ¶¶ 22, 45-47; Megregian Decl. ¶¶ 46-47.  As explained above, the Final Rule is likely to result in delayed abortions and other care, thereby increasing medical risk.  And patients will also lose their trust in their providers and the medical system as a whole.  There can be no question that such harm is irreparable.  *See Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004).

Moreover, if Planned Parenthood is forced to forgo Title X funding, shorten hours, lay off clinicians, and close health centers, vast numbers of women and men—many in underserved areas—will be left without a dedicated reproductive care provider, or access to that care at all. *See* Guttmacher Comment 10; Custer Decl. ¶¶ 114, 122-123; Atkinson Decl. ¶¶ 63-65; Black Decl. ¶ 60; Gardner Decl. ¶¶ 16, 63.  Those impacts will disrupt care not just for patients who rely on Title X for free or subsidized care, but for all patients served by affected facilities, including those on Medicaid or with private insurance.  *See, e.g.*, Custer Decl. ¶ 56.  And for those patients at Planned Parenthood health centers that do not close as a result of the Final Rule, they will no longer be able to rely on Title X and instead will be forced to pay for care they

cannot afford and thus might ration care or even go without.  *Id.* ¶ 92; Atkinson Decl. ¶ 64.

As detailed above, Planned Parenthood affiliates serve many regions where other providers have a limited ability to absorb the influx of patients left behind if the local Planned Parenthood health center were to close.  *See, e.g.*, Guttmacher Comment 10 & Tables 1-3; Custer Decl. ¶ 97; Kost Decl. ¶¶ 77-81.  As many courts have recognized, the loss of a patient's provider of choice is an irreparable harm that merits injunctive relief.  *See, e.g.*, *Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d 868, 886 (D. Ariz. 2012).  Moreover, for many patients, losing access to Planned Parenthood in particular would mean losing access to HIV, STI, and cancer screenings, contraceptives, and pregnancy tests, among other life-saving services.  *See* Brindis Comment 12; Custer Decl. ¶¶ 26-27; Atkinson Decl. ¶ 73; Kost Decl. ¶¶ 52-54.  That loss means diseases will go undetected, more women will have unwanted pregnancies, and prenatal care will be delayed.  *See* Custer Decl. ¶¶ 26-27; Brindis Decl. ¶¶ 23-25, 27-29; Kost Decl. ¶ 82.

AMA members practice in all States, and Planned Parenthood operates 600-plus health centers in 48 States and the District of Columbia.  Compl. ¶¶ 26, 35.  Absent an injunction against enforcement of the Final Rule, Plaintiffs, their members, and their patients will suffer these irreparable harms across the country, and the ultimate impact will be a public health crisis.

### C.    The Balance Of Equities And Public Interest Favor An Injunction

When the government is a party to a case in which a preliminary injunction is sought, the balance-of-the-equities and public-interest factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Both weigh heavily in Plaintiffs' favor.  The government seeks to upend the way the Title X program has worked with great success for nearly a half century.  It cannot credibly claim harm from preserving the status quo.  Conversely, injunctive relief is necessary to ensure that patients across the country retain access to their reproductive health care provider of choice.

As explained, the closure of Planned Parenthood health centers would leave many low-income Americans without access to their provider of choice—if they have any provider remaining at all. Other health centers would be unable to fill the gap of services that would exist. *See, e.g.*, Atkinson Decl. ¶ 69; Black Decl. ¶¶ 59-60. Past experience shows that when Planned Parenthood has had to close clinics because of funding cuts, the public health suffers. *See supra* pp.23, 42; Atkinson Decl. ¶¶ 73-75; *see also* Brindis Decl. ¶¶ 31, 47. The Ninth Circuit has "repeatedly recognized that individuals' interests in sufficient access to health care" are paramount, and that the public interest and balance of equities weigh in favor of an injunction where such access would otherwise be interrupted. *E.g.*, *Dominguez v. Schwarzenegger*, 596 F.3d 1087, 1098 (9th Cir. 2010), *vacated and remanded on other grounds by Douglas v. Independent Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012). A preliminary injunction would simply ensure that the Title X program is carried out as it has been for nearly 50 years. There is no need at all, let alone an urgent need, to change this life-saving program, and the government would suffer no harm from an injunction while this litigation proceeds.[8]

## V.    CONCLUSION

Plaintiffs' motion for a preliminary injunction should be granted.

---

[8]    This Court should waive any injunction bond under Rule 65(c). First, this case directly affects the public interest. *See Santa Rosa Mem. Hosp. v. Maxwell-Jolly*, 380 F. App'x 656, 658 (9th Cir. 2010), *vacated and remanded on other grounds by Douglas*, 565 U.S. 606. Second, Plaintiffs will be denied effective review if required to post a bond. Custer Decl. ¶ 126; Gardner Decl. ¶ 64; Udall Decl. ¶ 54; *see Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005). Third, the federal government will not incur any damages from the injunction. *See Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Smith*, 236 F. Supp. 3d 974, 999-1000 (W.D. Tex. 2017), *aff'd in part and rev'd in part on other grounds*, 913 F.3d 551 (5th Cir. 2019). Finally, Plaintiffs' "'likelihood of success on the merits … tips in favor of a minimal bond or no bond at all.'" *2Die4Kourt v. Hillair Capital Mgmt., LLC*, 692 F. App'x 366, 369 (9th Cir. 2017).

Dated:  March 21, 2019

Brian D. Vandenberg*
Leonard A. Nelson*
Erin G. Sutton*
AMERICAN MEDICAL ASSOCIATION
Office of General Counsel
300 N. Wabash Avenue
Chicago, IL 60611
brian.vandenberg@ama-assn.org
leonard.nelson@ama-assn.org
erin.sutton@ama-assn.org
*Pro hac vice
Counsel for Plaintiffs American Medical
Association and Oregon Medical Association

Mark Bonanno, OSB 942535*
OREGON MEDICAL ASSOCIATION
General Counsel
11740 SW 68th Parkway, Suite 100
Portland, OR 97223
mark@theoma.org
*Pro hac vice
Counsel for Plaintiffs American Medical
Association and Oregon Medical Association

Respectfully submitted.

s/ Per A. Ramfjord
Jeremy D. Sacks, OSB 994262
Per A. Ramfjord, OSB 934024
Kennon Scott, OSB 144280
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Tel.: (503) 224-3380
Fax: (503) 220-2480
jeremy.sacks@stoel.com
per.ramfjord@stoel.com
kennon.scott@stoel.com
Counsel for All Plaintiffs

Helene T. Krasnoff*
Carrie Y. Flaxman*
PLANNED PARENTHOOD
    FEDERATION OF AMERICA, INC.
1110 Vermont Avenue, NW, Suite 300
Washington, D.C.  20005
Tel.: (202) 973-4800
Fax: (202) 296-3480
helene.krasnoff@ppfa.org
carrie.flaxman@ppfa.org
*Pro hac vice
Counsel for Plaintiffs Planned Parenthood
Federation of America, Inc., Planned
Parenthood of Southwestern Oregon,
Planned Parenthood Columbia Willamette,
Thomas N. Ewing, M.D., and Michele P.
Megregian, C.N.M.

100791677.3 0099880-01222

Alan E. Schoenfeld*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com
*Pro hac vice
Counsel for Plaintiffs Planned Parenthood
Federation of America, Inc., Planned Parenthood
of Southwestern Oregon, Planned Parenthood
Columbia Willamette, Thomas N. Ewing, M.D.,
and Michele P. Megregian, C.N.M.

Paul R.Q. Wolfson*
Kimberly A. Parker*
Albinas J. Prizgintas*
Joshua M. Koppel*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
paul.wolfson@wilmerhale.com
kimberly.parker@wilmerhale.com
albinas.prizgintas@wilmerhale.com
joshua.koppel@wilmerhale.com
*Pro hac vice
Counsel for Plaintiffs Planned
Parenthood Federation of America, Inc.,
Planned Parenthood of Southwestern
Oregon, Planned Parenthood Columbia
Willamette, Thomas N. Ewing, M.D., and
Michele P. Megregian, C.N.M.