IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STATE OF OREGON et al.,                    6:19-cv-00317-MC (Lead Case)
                                           6:19-cv-00318-MC (Trailing Case)
            Plaintiffs,

                                           OPINION AND ORDER
      v.

ALEX M. AZAR II et al.

            Defendants,

and

AMERICAN MEDICAL ASSOCIATION,
et al.,

            Plaintiffs,

      v.

ALEX M. AZAR II et al.,

            Defendants.

_____

**MCSHANE, Judge**:

      Plaintiffs in these consolidated actions are 20 states, the District of Columbia, the

American Medical Association, the Oregon Medical Association, the Planned Parenthood

Federation and their local affiliates, and individual medical providers. They seek to enjoin the

1 – OPINION AND ORDER

United States Department of Health and Human Services, the Office of Population Affairs, and their respective leadership (collectively, the "Defendants" or "HHS") from implementing certain rules (the "Final Rule") that would alter the family planning program established by Title X of the Public Health Service Act, 42 U.S.C. § 300 *et seq*. The Final Rule was issued by HHS on March 4, 2019, and its effective date is May 3, 2019.

At the heart of their claims, Plaintiffs allege that the Final Rule is antithetical to public health and is a fundamental shift in policy away from Title X's emphasis on nondirective and voluntary family planning between low-income patients and their medical providers. Indeed, the rule would, among other things, dramatically limit medical professionals from discussing abortion options with their patients and completely prohibit them from referring patients seeking an abortion to a qualified provider (the "Gag Rule"). It would also require Title X providers to physically and financially divorce health services funded under Title X from abortion services funded from sources other than Title X (the "Separation Requirement").

At best, the Final Rule is a solution in search of a problem. At worst, it is a ham-fisted approach to health policy that recklessly disregards the health outcomes of women, families, and communities. In the guise of "program integrity," the Gag Rule prevents doctors from behaving like informed professionals. It prevents counselors from providing comprehensive counseling. It prevents low-income women from making an informed and independent medical decision. At the heart of this rule is the arrogant assumption that government is better suited to direct the health care of women than their medical providers. At a time in our history where government is assessing how we can improve and lower the costs of medical care to all Americans, the Final Rule would create a class of women who are barred from receiving care consistent with accepted and established professional medical standards. On top of that, the Separation Requirement

2 – OPINION AND ORDER

would create such a financial strain on Title X providers that, ironically, it would create a geographic vacuum in family planning that experts warn would lead to substantially more unintended pregnancies and, correspondingly, more abortions.

The harms outlined in the record before me, should the Final Rule be implemented, are extensive and are not rebutted by the government. A review of the scores of declarations from public health policy experts, medical organizations, doctors, and Title X providers lead to the inescapable conclusion that the Final Rule will result in negative health outcomes for low income women and communities. It will result in less contraceptive services, more unintended pregnancies, less early breast cancer detection, less screening for cervical cancer, less HIV screening, and less testing for sexually transmitted disease. HHS's response to these negative health outcomes is one of silence and indifference. Rather than providing contradictory data to support any positive health outcomes, they rationalize that the Final Rule "will ensure compliance with, and implementation of, the statutory requirement that none of the funds appropriated for Title X may be used in programs where abortion is a method of family planning." At the same time, despite the nearly fifty-year history of Title X, they cannot point to one instance where Title X funds have been misapplied under past or current rules.

Without revealing what evidence, if any, helped shape its opinions, HHS essentially says, "trust us, this will work out fine." But dramatic changes to the only federal program providing family planning services to millions of clients in marginalized communities requires something more than a mere hunch. The dearth of evidence and lack of transparency in HHS's rulemaking is particularly concerning as HHS earlier concluded that there was "no evidence that [the Gag Rule] can and will work operationally on a national basis in the Title X program." 65 Fed. Reg. at 41,271.

3 – OPINION AND ORDER

Should the Final Rule go into effect in mere days, the risk of irreparable damage to the health of women and communities is grave. In contrast, keeping the current regulations in place—regulations that "have been used by the program for virtually its entire history," *id.*, and have provided critical medical services for at-risk communities—poses no harm to Defendants.

As discussed below, Plaintiffs are likely to succeed on the merits of their claim that the Final Rule is contrary to law. Additionally, Plaintiffs raise serious questions going to the merits of their claims that the Final Rule is arbitrary and capricious. Plaintiffs have demonstrated the likelihood of "irreparable harm" and that the balance of equities tips sharply in their favor. Plaintiffs' Motions for a Preliminary Injunction are GRANTED.

## FACTUAL BACKGROUND

Congress enacted the Title X program, known as the "Population Research and Voluntary Planning Program," in 1970 as part of the Public Health Services Act. Its mission is to provide grants to public and non-profit organizations "to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. § 300(a). Title X targets low income families and individuals and provides family planning services at low or no cost. The stated purpose of Title X is to promote positive birth outcomes and healthy families by allowing individuals to decide the number and the spacing of their children.

Congress authorized HHS to promulgate regulations to effectuate Title X's mission, largely through the award of grants to providers of family planning services to low income individuals. 42 U.S.C. § 300a-4. Title X grants are administered by the Office of the Assistant Secretary for Health through the Office of Population Affairs. The statute and regulations of

4 – OPINION AND ORDER

Title X require that 90 percent of congressional appropriations be used for clinical family planning purposes. Title X funds a broad array of family planning services: contraceptive services, information, and education; natural family planning and education; infertility services; services to adolescents; HIV and sexually transmitted disease screening and referral; breast and cervical cancer screenings; and pregnancy testing.

By all accounts, for nearly 50 years, the Title X program has been a great success in meeting its stated goals. According to HHS's 2017 Summary, the program served over 4 million family planning clients at 3,858 service sites through 6.6 million family planning encounters. Those served are largely from vulnerable populations who would not otherwise have access to health care. Title X clinics provided over 2 million Chlamydia tests, 2.5 million Gonorrhea tests, 2 million HIV tests, and over 700,000 syphilis tests. Title X providers conducted Pap screening on nearly 650,000 clients and breast exams on 878,492 women. *See* Title X Family Planning Annual Report 2017 Summary, www.hhs.gov/opa/title-x-family-planning/fp-annual-report/fpar-2017 (last visited April 25, 2019). By regularly providing millions of patients with contraceptive services, the Title X program has significantly reduced the rates of unintended pregnancy and abortion. In fact, unintended pregnancies and abortions are now at historic lows, in large part due to Title X. Kost Decl. ¶¶ 7, 35, ECF No. 53; Brindis Decl. ¶ 26, ECF No. 52; Lawrence B. Finer & Mia R. Zolna, *Declines in Unintended Pregnancy in the United States, 2008-2011*, 374 New Eng. J. Med. 843, 850 (2016) (noting unintended pregnancy rate in United States dropped to a 30-year low in 2011).

At issue in this case is the agency's interpretation of the congressional mandate found in the final sentence of Title X known as "Section 1008." 42 U.S.C. § 300a-6. This mandate requires that "None of the funds appropriated under this title shall be used in programs where

5 – OPINION AND ORDER

abortion is a method of family planning." 42 U.S.C. § 300a-6. Historically, HHS has taken the position that medical professionals may provide neutral and factual information, even concerning abortion, as a part of pregnancy counseling. The agency squared such counseling with Section 1008 because "the provision of neutral and factual information about abortion is not considered to promote or encourage abortion as a method of family planning." 65 Fed. Reg. at 41,271. HHS generally allowed the medical professional's objective professional judgment, aided by the patient's particular needs, to drive pregnancy counseling. Earlier rules also allowed abortion referrals.

The Final Rule deviates sharply from the historical interpretation of Section 1008. HHS used the same justification—that the Final Rule will ensure compliance with Section 1008's requirement that no Title X funds "shall be used in programs where abortion is a method of family planning"—in 1988 when it promulgated similar rules. Those rules, like the Final Rule at issue here, prohibited abortion referrals and required strict financial and physical separation between Title X projects and services prohibited by Title X.

Numerous Title X grantees and doctors impacted by the 1988 rule challenged the regulations alleging, as relevant here, that the Gag Rule and Separation Requirement were not authorized by Title X and thus were arbitrary and capricious. The Supreme Court ultimately upheld the 1988 rules. The Court examined Section 1008's prohibition on using Title X funds "in programs where abortion is a method of family planning." The Court, like every other court to examine the statutory language and legislative history of Section 1008, found the statute ambiguous. "If a statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. The Secretary's construction of Title X may not be disturbed as an abuse of discretion if it

6 – OPINION AND ORDER

reflects a plausible construction of the plain language of the statue and does not otherwise

conflict with Congress' expressed intent." *Rust, v. Sullivan*, 500 U.S. 173, 184 (1991) (internal

quotations and citation omitted). The fact that the 1988 rules represented a "sharp break with

prior interpretations" by HHS did not mean the new rules were invalid, because "the agency, to

engage in informed rulemaking, must consider varying interpretations and the wisdom of its

policy on a continuing basis.'" *Id.* at 185 (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council,

Inc.*, 467 U.S. 837, 862 (1984)). In rejecting Plaintiffs' arguments challenging the Gag Rule,

Justice Rehnquist concluded HHS adequately justified the change from prior policy:

> The Secretary explained that the regulations are a result of his determination, in
> the wake of the critical reports of the General Accounting Office (GAO) and the
> Office of the Inspector General (OIG), that prior policy failed to implement
> properly the statute and that it was necessary to provide 'clear and operational
> guidance' to grantees about how to preserve the distinction between Title X
> programs and abortion as a method of family planning.' 53 Fed. Reg. 2923-2924
> (1988). He also determined that the new regulations are more in keeping with the
> original intent of the statute, are justified by client experience under the prior
> policy, and are supported by a shift in attitude against the 'elimination of unborn
> children by abortion.' We believe that these justifications are sufficient to support
> the Secretary's revised approach. Having concluded that the plain language and
> legislative history are ambiguous as to Congress' intent in enacting Title X, we
> must defer to the Secretary's permissible construction of the statute.

*Id.* at 173.

As for the Separation Requirement, the Court found that "the program integrity

requirements are based on a permissible construction of the statute and are not inconsistent with

congressional intent." *Id.* at 188. Once again, the Secretary adequately justified his reasoning:

> Indeed, if one thing is clear from the legislative history, it is that Congress
> intended that Title X funds be kept separate and distinct from abortion-related
> activities. It is undisputed that Title X was intended to provide primarily
> prepregnancy preventative services. Certainly the Secretary's interpretation of the
> statute that separate facilities are necessary, especially in light of the express
> prohibition of § 1008, cannot be judged unreasonable. Accordingly, we defer to

7 – OPINION AND ORDER

> the Secretary's reasoned determination that the program integrity requirements
> are necessary to implement the prohibition.

*Id.* at 190.

Although the Court allowed the 1988 rules to stand, HHS never implemented those

regulations on a national scale. 65 Fed. Reg. at 41,271. And, in 1993, HHS suspended the 1988

regulations, finding them to be "an inappropriate implementation of the Title X statute." 58 Fed.

Reg. at 7464.

In 1996 (five years after the Supreme Court's decision in *Rust*), Congress clarified that its

prohibition on Title X abortion funding did not prohibit the nondirective counseling of pregnant

women. To the contrary, Congress mandated that "all pregnancy counseling shall be

nondirective" with respect to Title X. Omnibus Consolidated Rescissions and Appropriations

Act, 1996, Pub. L. No. 104-134, Title II, 110 Stat. 1321 (1996). This congressional mandate has

appeared in every subsequent Title X appropriations statute from 1996 until present. *See*

Department of Defense and Labor, Health and Human Services, and Education Appropriations

Act, 2019 and Continuing Appropriations Act, 2019, Pub. Law. No 115-245, Title II, 132 Stat.

2981, 3070-71 (September 28, 2018).

In 2000, HHS issued new Title X rules that remain in effect to this day. The 2000

regulations officially revoked the 1988 rules that were validated by the *Rust* court but never

implemented by HHS. The agency concluded that the Gag Rule from the 1988 rules "endangers

women's lives and health by preventing them from receiving complete and accurate medical

information and interferes with the doctor-patient relationship by prohibiting information that

medical professionals are otherwise ethically and legally required to provide to their patients." 65

Fed. Reg. at 41,270. The 2000 rules required the provider to offer the pregnant woman the

opportunity to be "provided information and counseling regarding each of the following options:

(A) Prenatal care and delivery; (B) Infant care, foster care, or adoption; and (C) Pregnancy

termination. 65 Fed. Reg. at 41,279. Regarding nondirective counseling, the 2000 rules provided:

> If requested to provide such information and counseling, provide neutral, factual
> information and nondirective counseling on each of the options, and referral upon
> request, except with respect to any option(s) about which the pregnant woman
> indicates she does not wish to receive such information and counseling.

*Id.*

Nondirective counseling meant the grantee "may not steer or direct clients toward

selecting any option, including abortion[.]" *Id.* at 41,273. Referrals for abortion were once again

allowed, provided the client requested such a referral. *Id.* at 41,274. Finally, HHS determined

that financial separation, rather than financial and physical separation, was sufficient to abide by

Section 1008.

Ten years after HHS implemented the 2000 regulations still in place today, Congress

spoke again on the matter. In passing the Affordable Care Act in 2010, Congress once again

limited the rulemaking authority of HHS. There, Congress expressly prohibited HHS from

promulgating any regulation that:

> (1) creates any unreasonable barriers to the ability of individuals to obtain
> appropriate medical care; (2) impedes timely access to health care services; (3)
> interferes with communications regarding a full range of treatment options
> between the patient and the provider; (4) restricts the ability of health care
> providers to provide full disclosure of all relevant information to patients making
> health care decisions; (5) violates the principles of informed consent and the
> ethical standards of health care professionals; or (6) limits the availability of
> health care treatment for the full duration of a patient's medical needs.

42 U.S.C. § 18114.

Given the above context, I turn to the Final Rule at issue here. HHS published the Final

Rule in the Federal Register on June 1, 2018. During the 60-day public comment period, HHS

9 – OPINION AND ORDER

received more than 500,000 comments. Certain revisions were made to the proposed rule and HHS published the Final Rule in the Federal Register on March 4, 2019.[1] The rule has an implementation date of May 3, 2019.

As expressed by HHS in its executive summary, the purpose of the Final Rule, as it relates to Section 1008, is "to ensure compliance with, and enhance implementation of, the statutory requirement that none of the funds appropriated for Title X may be used in programs where abortion is a method of family planning." 84 Fed. Reg. at 7717. For purposes of this litigation, Plaintiffs' claims center on two aspects of the final rule that they refer respectively to as: (1) The Gag Rule; and (2) The Separation Requirement.

Turning first to the Gag Rule, the Final Rule provides that a "Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion." 84 Fed. Reg. at 7788-89 (to be codified at 42 C.F.R. § 59.14). Without doubt, the Final Rule limits the provider's options when presented with a pregnant woman.

First, once a patient is identified as pregnant, "she shall be referred to a health care provider for medically necessary prenatal health care." 84 Fed. Reg. at 7789 (to be codified at 42 C.F.R. § 59.14). This referral for prenatal health care is mandatory. Next, the provider may, but is not required to, "provide the following counseling and/or information to her:"

    (i)      Nondirective pregnancy counseling, when provided by physicians or advanced practice providers;

    (ii)     A list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care);

    (iii)    Referral to social services or adoption agencies; and/or

---

[1] Plaintiffs filed their complaints the following day, on March 5, 2019. Due to the closely-approaching implementation date, the court set an expedited briefing schedule and, just days ago, heard oral arguments.

10 – OPINION AND ORDER

> (iv)    Information about maintaining the health of the mother and unborn child during pregnancy.

*Id.*

If the provider chooses to provide a list of comprehensive health care providers, the list "may be limited to those that do not provide abortion, or may include licensed, qualified, comprehensive primary health care providers (including providers of prenatal care), some, but not the majority, of which also provide abortion as part of their comprehensive health care services. Neither the list nor project staff may identify which providers on the list perform abortions." *Id.*

Plaintiffs also challenge the Final Rule's Separation Requirement. The Separation Requirement provides that any "Title X project must be organized so that it is physically and financially separate . . . from activities which are prohibited [in the Final Rule]." 84 Fed. Reg. at 7789 (to be codified at 42 C.F.R. § 59.15). According to HHS, complete physical and financial separation between a Title X program and any activities falling outside of Title X is necessary to: (1) comply with Section 1008; (2) eliminate the "significant risk for public confusion" over whether Title X funds are allocated for abortion-related purposes; and (3) "address the concern that Title X resources could facilitate the development of, and ongoing use of, infrastructure for non-Title X activities." 84 Fed. Reg. at 7715.

Plaintiffs ask the court to issue a nationwide preliminary injunction restraining HHS from implementing the Final Rule. Absent an injunction, the Final Rule goes into effect in four days, on May 3, 2019.

## STANDARDS

A plaintiff seeking a preliminary injunction must establish: (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When, as here, the government is a party, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). When there are "serious questions going to the merits," a court may still issue a preliminary injunction when "the balance of hardships tips sharply in the plaintiff's favor," and the other two factors are met. *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). The court's decision on a motion for a preliminary injunction is not a ruling on the merits. *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

## DISCUSSION

Under the APA, a court's review of an agency decision should be searching but narrow, and the reviewing court should take care not to substitute its judgment for that of the agency. *Oregon Wild v. United States*, 107 F. Supp. 3d 1102, 1109 (D. Or. 2015) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). Under this review, the court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

As noted, many of the arguments put forward by Plaintiffs are ones the Supreme Court previously rejected when considering the (remarkably similar) rules in *Rust*. At first blush, one could be persuaded that *Rust* controls the outcome here. In fact, most of HHS's arguments—specifically in its written response, where it cited *Rust* on 168 occasions—simply point to *Rust* as

12 – OPINION AND ORDER

evidence the Final Rule is a lawful exercise of agency discretion. *See Defs.' Opp'n,* 17; ECF No. 83 ("*Rust's* on-point statutory holding—and the remarkable overlap between Plaintiffs' arguments and the ones *Rust* rejected—disposes of the claim that the materially indistinguishable Rule is unlawful.").

HHS would seemingly have the court believe *Rust* concluded the Gag Rule and Separation Requirement were required interpretations of Section 1008. But *Rust* contains no such holding. *Rust* merely held that in light of the ambiguous nature behind Congress's intent in enacting Title X generally, and Section 1008 specifically, HHS's interpretation of Section 1008 was not unreasonable:

> The broad language of Title X plainly allows the Secretary's construction of the statute. By its own terms, § 1008 prohibits the use of Title X funds "in programs were abortion is a method of family planning." Title X does not define the term "method of family planning," nor does it enumerate what types of medical and counseling services are entitled to Title X funding. Based on the broad directives provided by Congress in Title X in general and § 108 in particular, we are unable to say that the Secretary's construction of the prohibition in § 1008 to require a ban on counseling, referral, and advocacy within the Title X project is impermissible.

*Rust*, 500 U.S. at 184.

Additionally, the Court clarified that "[a]t no time did Congress directly address the issues of abortion counseling, referral, or advocacy." *Id.* at 185. Given the lack of direction from Congress, and considering HHS provided ample justification for its reasoning in revising the rules, the Court deferred to the agency's "permissible construction of the statute." *Id.* at 187.

Two significant facts, however, separate this case from *Rust.* First, Congress has consistently mandated since 1996 that "that all pregnancy counseling shall be nondirective" with respect to Title X. Omnibus Consolidated Rescissions and Appropriations Act, 1996 Pub. L. No. 104-134, Title II, 110 Stat. 1321, 1321-22 (1996). Second, the 2010 limitations Congress

13 – OPINION AND ORDER

included in the Affordable Care Act significantly limit HHS's rulemaking authority. Therefore, HHS must do more than merely dust off the 30-year old regulations and point to *Rust*.

HHS makes the head-scratching argument that neither of the post-*Rust* laws enacted by Congress can serve as an implied repeal of Section 1008 or overrule *Rust*. HHS argues, "A clear, authoritative judicial holding on the meaning of a particular provision should not be cast in doubt and subjected to challenge whenever a related though not utterly inconsistent provision is adopted in the same statute or even in an affiliated statute." *Defs.' Opp'n,* 19 (quoting *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1520 (2017)). That premise is certainly correct. But *TC Heartland* involved a statutory term the Supreme Court previously had "definitively and unambiguously held . . . has a particular meaning[.]" 137 S. Ct. at 1520. The Court therefore quite appropriately pointed out that "[T]he modification by implication of the settled construction of an earlier and different section is not favored." *Id.* (quoting *United States v. Madigan*, 300 U.S. 500, 506 (1937)). But the rule regarding implied repeal has no application here, where *Rust* expressly held that the statute in question was ambiguous. Again, *Rust* merely held that because Congress had not spoken on the matter, HHS's Gag Rule and Separation Requirement were reasonable interpretations of Section 1008 at that time. But Congress has since spoken on the matter.

Additionally, I note that absolutely nothing in the appropriations mandate that "all pregnancy counseling shall be nondirective," or the express limitations Congress placed on HHS's rulemaking authority in the ACA, necessarily conflict with Section 1008's requirement that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." HHS's vigor in arguing that the appropriations act and the ACA "cannot repeal Section 1008" or "overrule *Rust*" only demonstrates that the Final Rule

14 – OPINION AND ORDER

conflicts with both statutes. After all, not all interpretations place the three statutes at odds with one another. The current regulations, which have been in place for nearly five decades, allow Section 1008, the appropriations language, and the ACA restrictions to live in harmony. *Rust* explicitly commented that the plaintiffs' argument that the legislative history behind Title X rendered the 1988 rules contrary to law was, in fact, one permissible interpretation. *Rust*, 500 U.S. at 189. But because HHS's interpretation was also a permissible interpretation, deference to the agency's reasonable interpretation carried the day. *Id.* ("While petitioner's interpretation of the legislative history may be a permissible one, it is by no means the only one, and it is certainly not the one found by the Secretary."). The question now is whether, given the two new statutes, HHS's 30-year-old rules remain "one permissible interpretation."

I turn first to the Final Rule's Gag Rule. As noted, the Final Rule prohibits referrals for abortions. HHS argues that although "all pregnancy counseling shall be nondirective," Congress said nothing about referrals. This argument appears a stretch. First, HHS includes referrals within pregnancy counseling in the Final Rule. For example, in its guidance for nondirective pregnancy counseling, the agency states, "Title X projects should not use nondirective pregnancy counseling, *or referrals made for prenatal care or adoption during such counseling*, as an indirect means of encouraging or promoting abortion as a method of family planning." 84 Fed. Reg. at 7747 (emphasis added). The above guidance aligns with Congress's thoughts on referrals. Congress, in ordering HHS to make grants available to assist "*in providing* adoption information and *referrals* to pregnant women on an equal basis *with all other courses of action included in nondirective counseling* to pregnant women," clearly included referrals in nondirective counseling. 42 U.S.C. § 254c-6(a)(1) (emphasis added).

15 – OPINION AND ORDER

Although common sense, the agency's own guidance, and Congress's statutory language indicate pregnancy counseling includes referrals, a different outcome would not save the Final Rule from violating the requirement that all pregnancy counseling be nondirective. Regardless of the referral process (discussed further below), the Final Rule blatantly requires that any pregnancy counseling for abortion be directive. For the Final Rule, this is a problem, as it is well established that Congress "may amend substantive law in an appropriations statute, as long as it does so clearly." *Robertson v. Seattle Audobon Soc'y*, 503 U.S. 429, 441 (1992). Congress is quite clear on its thoughts regarding pregnancy counseling: "all pregnancy counseling shall be nondirective."

Although the Final Rule does not define "nondirective counseling," it provides guidance on the term. The agency describes "nondirective counseling" as:

> the meaningful presentation of options where the physician or advanced practice provider (APP) is not suggesting or advising one option over another. . . . Nondirective counseling does not mean that the counselor is uninvolved in the process or that counseling and education offer no guidance, but instead that clients take an active role in processing their experiences and identifying the direction of the interaction. In nondirective counseling, the Title X physicians and APPs promote the client's self-awareness and empower the client to be informed about a range of options, consistent with the client's expressed need and with the statutory and regulatory requirements governing the Title X program. *In addition, the Title X provider may provide a list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care), some (but not the majority) of which may provide abortion in addition to comprehensive primary care.*"[2]

84 Fed. Reg. at 7716 (internal quotations, citation, and footnote omitted) (emphasis added).

Examining the Final Rule's requirement for abortion counseling confirms it is anything but nondirective. After confirming that the provider need not provide any pregnancy counseling

---

[2] The emphasized portion, concerning a type of referral, which appears in the Final Rule's section on guidance for what "Nondirective pregnancy counseling is," is yet another example that the agency (along with all of the expert opinions submitted in the record) views referrals as simply one portion of the entire counseling process.

16 – OPINION AND ORDER

at all, the Final Rule outlines what counseling is permissible should the provider decide to offer such counseling:

> Nondirective counseling is designed to assist the patient in making a free and informed decision. *In nondirective counseling, abortion must not be the only option presented by physicians or APPs;* otherwise the counseling would violate the Congressional directive that all pregnancy counseling be nondirective, but also the prohibitions in this rule on encouraging, advocating, or supporting abortion as a method of family planning, which the Department prohibits in order to implement, among other provisions, section 1008. Each option discussed in such counseling must be presented in a nondirective manner. This involves presenting the options in a factual, objective, and unbiased manner and (consistent with the other Title X requirements and restrictions) offering factual resources that are objective, rather than presenting the options in a subjective or coercive manner. *Physicians or APPs should discuss the possible risks and side effects to both mother and unborn child of any pregnancy option presented,* consistent with the obligation of health care providers to provide patients with accurate information to inform their health care decisions.

84 Fed. Reg. at 7747 (emphasis added).

Like nearly every other aspect of the Final Rule, the agency creates one set of rules for abortion, and a separate set of rules for everything else. Back in 1988, this was a permissible interpretation of the then lone congressional requirement that no Title X funds "be used in programs where abortion is a method of family planning." But when implementing a rule in 2019, HHS must comply not only with Section 1008, but also with Congress's requirement that "all pregnancy counseling be nondirective." HHS's mistake, here and throughout the Final Rule, assumes that Section 1008 trumps Congress's other mandates. But as noted above, the statutes are not irreconcilable.

For all pregnancy counseling not involving abortion, the Final Rule allows "the clients [to] take an active role in processing their experiences and identifying the direction of the interaction . . . [while allowing the providers to] promote the client's self-awareness and empower the client to be informed about a range of options, *consistent with the client's*

17 – OPINION AND ORDER

*expressed need*[.]" 84 Fed. Reg. at 7716 (emphasis added). This is not the case, however, if the empowered client wishes to exercise abortion in that range of options. During abortion counseling, the medical professional no longer provides neutral, factual information "consistent with the client's expressed need[.]" Fed. Reg. at 7716. Instead, the provider must provide counseling regarding some other option the client has no use for, even when it is not requested by the client or even medically relevant.[3] The Gag Rule is the very definition of directive counseling. It makes no difference that HHS labels this process "nondirective counseling," or that HHS states such requirements are necessary to avoid, according to HHS's own interpretation, "the prohibitions in this rule on encouraging, advocating, or supporting abortion as a method of family planning [under Section 1008]." 84 Fed. Reg. at 7747. It is clear that while giving lip service to the requirement that all pregnancy counseling be nondirective, HHS never sought to actually interpret that mandate in coordination with Section 1008. As the Gag Rule is not "in accordance with the law," it violates the APA. 5 U.S.C. § 706(2)(A).

As odd as the pregnancy counseling process is, it pales in comparison to the Final Rule's requirements for abortion referrals. One would expect to find such a process not in a federal program serving millions of clients, but in a Kafka novel. As described above, if a woman seeks to have a legal abortion and requests a referral from her Title X provider, the Final Rule requires a referral for prenatal care. That is, the provider is mandated to refuse to provide the referral the client wants, and instead provide a referral the client neither needs nor requested. *See* 84 Fed. Reg. 7789 (to be codified at 42. C.F.R. § 59.14(b)) (requiring that after the client is "verified as

---

[3] For some reason—and the Court struggles here with finding any rational relationship to any medical purpose—the Final Rule allows, and in fact encourages, that the provider "should discuss the possible risks and side effects to both mother and unborn child of any pregnancy option presented[.]" 84 Fed. Reg. at 7747. In other words, the Final Rule encourages the provider to counsel a woman who has chosen to proceed with a legal abortion on the possible risks and side effects to the fetus.

pregnant, she shall be referred to a health care provider for medically necessary prenatal health care").

Amazingly, the Final Rule allows the provider, at its whim, to refer the woman not to an abortion clinic, but to an adoption agency. *Id.* § 59.14(b)(1)(iii).[4] Or, the provider may provide a list of primary care providers, none of whom actually perform abortions. *Id.* § 59.14(c)(2). The rule also allows the counselor to provide "[i]nformation about maintaining the health of the . . . unborn child during pregnancy." *Id.* § 59.14(b)(1)(iv).

Possibly, the woman might be lucky enough to live near a Title X provider who—in accordance with the professional ethical obligations of medical providers—agrees to refer a woman seeking an abortion to an actual abortion clinic. Even then, the woman is not much closer to actually receiving a proper referral. One would think the provider could simply say, "We do not perform abortions. Title X does not allow Title X funds to be used to perform abortions. But here is a referral to an independent medical provider, who receives no Title X funds, who will help you." But the Final Rule does not allow that. Instead, after referring the woman to a provider of prenatal care (as is mandatory), the provider may provide "[a] list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care)[.]" *Id.* § 59.14(b)(1)(ii). If the sympathetic counselor provides this list, HHS allows the list to include some providers "which also provide abortion as part of their comprehensive health care services." *Id.* § 59.14(c)(ii). However, in what one imagines would come as a shock to this poor woman, the list is prohibited from including a majority of providers who actually provide abortion services. *Id.* At this point, the woman is staring at multiple names on a list. As is usual

---

[4] It is difficult to comprehend that Congress would so adamantly require that all pregnancy counseling be nondirective, only to later allow the provider to refer a woman seeking an abortion to an adoption agency.

in the medical setting, she might ask the provider, whom she trusts, for a single recommendation. At this point, the provider may only say, "I'm sorry, I cannot help you." In the agency's zeal to limit any abortions, even legal abortions provided outside the Title X program, the Final Rule states, "Neither the list nor project staff may identify which providers on the list perform abortions." *Id.*

The Gag Rule is remarkable in striving to make professional health care providers deaf and dumb when counseling a client who wishes to have a legal abortion or is even considering the possibility. The rule handcuffs providers by restricting their responses in such situations to providing their patient with a list of primary care physicians who can assist with their pregnancy without identifying the ones who might perform an abortion. Again, the response is required to be, "I can't help you with that or discuss it. Here is a list of doctors who can assist you with your pre-natal care despite the fact that you are not seeking such care. Some of the providers on this list—but in no case more than half— may provide abortions services, but I can't tell you which ones might. Have a nice day."[5] This is madness. Plaintiffs have shown what is reflected in the sophistry of the Final Rule itself—that they are likely to succeed on their claim that the Gag Rule is contrary to law. I turn now to the Separation Requirement.

As noted, the Separation Requirement requires physical and financial separation of Title X services and those services prohibited under the Final Rule. 84 Fed. Reg. at 7789 (to be codified at 42 C.F.R. § 59.15). Separation is required not only if the provider itself performs abortions, but when the provider performs any activities that, in HHS's view, "promote . . . or support abortion as a method of family planning[.]" *Id.* at 7788-89 (to be codified at 42 C.F.R. §

---

[5] This is as silly as it is insulting. I cannot imagine visiting my urologist's office to request a vasectomy, only to be given a list of fertility clinics. I would think that my doctor had gone mad.

59.14). In short, any activity prohibited by the Gag Rule must have no connection, physically or

financially, from activities allowed under the Final Rule. *See id.* at 7789 (to be codified at 42

C.F.R. § 59.15 (requiring separation of activities prohibited under Section 1008 as well as 42

C.F.R. §§ 59.13, 59.14, 59.16)).

    To ensure that a Title X grantee is in compliance with the Separation Requirement, the

Final Rule allows the agency to consider the following facts and circumstances:

> (a) The existence of separate, accurate accounting records;
> (b) The degree of separation from facilities (e.g. treatment, consultation,
>     examination and waiting rooms, office entrances and exits, shared phone
>     numbers, email addresses, educational services, and websites) in which
>     prohibited activities occur and the extent of such prohibited activities;
> (c) The existence of separate personnel, electronic or paper-based health care
>     records, and workstations; and
> (d) The extent to which signs and other forms of identification of the Title X
>     project are present, and signs and material referencing or promoting abortion
>     are absent.

*Id.* at 7789 (to be codified at 42 C.F.R. § 59.15)

    In explaining its reasoning for adding physical separation in addition to the previous

requirement of financial separation, the agency does not once mention consideration of any

limitations Congress imposed under the ACA. Instead, the agency focuses solely on Section

1008 and *Rust*. *Id.* at 7763-7767.

    As noted, Congress passed the Affordable Care Act in 2010. The ACA spoke directly to

HHS, prohibiting it from promulgating any regulation that:

> (1) creates any unreasonable barriers to the ability of individuals to obtain
> appropriate medical care; (2) impedes timely access to health care services; (3)
> interferes with communications regarding a full range of treatment options
> between the patient and the provider; (4) restricts the ability of health care
> providers to provide full disclosure of all relevant information to patients making
> health care decisions; (5) violates the principles of informed consent and the
> ethical standards of health care professionals; or (6) limits the availability of
> health care treatment for the full duration of a patient's medical needs.

21 – OPINION AND ORDER

42 U.S.C. § 18114.

HHS first argues that Plaintiffs waived any ACA-based challenge to the Final Rule. First, the court is skeptical that an agency may defend an action challenging the scope of the agency's authority solely with an argument that the plaintiff waived any such challenge. *See Sierra Club v. Pruitt*, 293 F. Supp. 3d 1050, 1061 (N.D. Cal. 2018) (noting "the waiver rule does not apply to preclude argument where the scope of the agency's power to act is concerned."). HHS's waiver argument relies on the premise that, so long as no one specifically challenges the agency's authority during the notice and comment period, the agency has the freedom to act in blatant violation of its Congressional authorization.

Regardless, I conclude Plaintiffs have not waived any challenge based on the ACA. Waiver does not apply "if an agency has had the opportunity to consider the issue." *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007). This is true even if a third party, as opposed to the plaintiffs, put the agency on notice by providing the agency the opportunity to correct its error. *Id.* Here, while not specifically pointing to 42 U.S.C. § 18114, multiple commenters objected under each prong of the statute. *See* AMA Reply, 11-12 n.3; ECF No. 119 (meticulously matching specific comments to each prong of 42 U.S.C. § 18114); *see also* States' Reply, 9 n.7; ECF No. 121 (same).

HHS's other arguments regarding why Section 18114 does not apply to Title X are unpersuasive. HHS argues that had Congress wanted to limit Title X, it would have listed the title in Section 18114. HHS also argues the restrictions are somehow "overbroad" or "open-ended." Simply because Congress specifically sought to limit the general scope of HHS's rulemaking abilities, however, does not somehow render the limitations invalid. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative

22 – OPINION AND ORDER

agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). That regulations issued by HHS 30 years ago might clash with limitations Congress later placed on HHS does not mean HHS may ignore the newer restrictions.

That Congress intended in Section 18114 to limit HHS's rulemaking authority appears clear. Before delineating the six new restrictions, Congress stated, "Notwithstanding any other provision of this Act, the Secretary of Health and Human Services *shall not promulgate any regulation that . . . .*" 42 U.S.C. § 18114. The Final Rule, of course, is a regulation promulgated by HHS. The agency argues the language, "Notwithstanding any other provision of this Act," means Congress meant the limitations to apply only to regulations the ACA authorized HHS to implement. I disagree. That language merely indicates that the specific limitations in Section 18114 override any conflicting provisions of the ACA. *See Field v. Napolitano*, 663 F.3d 505, 511 (1st Cir. 2011) (noting that statute's use of "Notwithstanding any other provision of law" "clearly signals the drafter's intention that the provisions of 'notwithstanding' section override conflicting provisions of any other section") (quoting *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993)). The Supreme Court agrees that "notwithstanding" language indicates the drafter intended "to supersede all other laws" and that a "clearer statement is difficult to imagine." *Cisneros*, 508 U.S. at 18 (citation omitted).

I conclude Plaintiffs have demonstrated the limitations in Section 18114 likely apply to the Final Rule. The first and second limitations prohibit HHS from implementing any regulation that: "(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; [or] (2) impedes timely access to health care services[.]" 42 U.S.C. § 18114. At this stage, there is at least a strong argument to be made that the Separation Requirement creates unreasonable barriers to Title X clients obtaining appropriate medical care and impedes their

23 – OPINION AND ORDER

timely access to such care. To ensure compliance with the rule, HHS encourages Title X

providers to maintain one set of offices for Title X services and physically separate offices for

any service prohibited by the Gag Rule. 84 Fed. Reg. at 7789. The provider should ensure the

offices do not share entrances or exits, waiting rooms, or even websites. *Id.* The provider must

ensure the separate offices maintain "[t]he existence of separate personnel, electronic or paper-

based health care record, and workstations[.]" *Id.* Although the declarations indicate the financial

burdens will severely strain already tight budgets, I also am mindful of the fact that many of the

rules underlying the Separation Requirement would impinge on the ability of providers to engage

in nondirective counseling, in contrast with the congressional mandate.

 Even assuming, however, that the ACA does not apply to the Final Rule, or that the

Separation Requirement does not create impermissible barriers to client care, Plaintiffs have

demonstrated, at worst, serious questions going to the merits of their claims that the Final Rule is

arbitrary and capricious. "Normally, an agency rule would be arbitrary and capricious if the

agency has relied on factors which Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the produce of agency expertise." *Motor Vehicle Manufacturers Ass'n v.*

*State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

 Based on the record currently before the Court, the Final Rule appears to force medical

providers to either drop out of the program or violate their codes of professional ethics. James L.

Madara, MD, is a Medical Doctor, the Chief Executive Officer and Executive Vice President of

the AMA, and an adjunct professor of pathology at Northwestern University. Madara Decl. ¶ 1;

ECF No. 49. The AMA "is the largest professional association of physicians, residents, and

24 – OPINION AND ORDER

medical students in the United States." *Id.* ¶ 5. To call the AMA the leading organization
regarding medical ethics is practically an understatement. The AMA literally wrote the book on
medical ethics. "The AMA has published the *Code of Medical Ethics of the American Medical
Association* since 1847. This was the first modern national medical ethics code in the world and
continues to be the most comprehensive and well respected code for physicians, world-wide." *Id.*
¶ 13. Dr. Madara outlines several troubling aspects of the Final Rule:[6]

> 17. "Except in emergency situations in which a patient is incapable of making an
> informed decision, withholding information without the patient's knowledge or
> consent is ethically unacceptable." *Code of Medical Ethics* Opinion 2.1.3.
> *Withholding Information from Patients.*

> 18. Therefore, patients have the right "to receive information from their
> physicians and to have the opportunity to discuss the benefits, risks, and costs of
> appropriate treatment alternatives… [P]atients should be able to expect that their
> physicians will provide guidance about what they consider the optimal course of
> action for the patient based on the physician's objective professional judgment."
> *Code of Medical Ethics* Opinion 1.1.3. *Patient Rights.* Further, patients have a
> right to "expect that their physician will cooperate in coordinating medically
> indicated care with other health care professionals[.]" *Id.* Finally, physicians
> should "[h]onor a patient's request not to receive certain medical information."
> *Code of Medical Ethics* Opinion 2.1.3. *Withholding Information from Patients.*

> 19. Physicians are ethically obligated to "[b]ase the decision or recommendation
> [to consult or refer] on the patient's medical needs, as they would for any
> treatment recommendation, and consult or refer the patient to only health care
> professionals who have appropriate knowledge and skills and are licensed to
> provide the services needed." *Code of Medical Ethics* Opinion 1.2.3.
> *Consultation, Referral, & Second Opinions.*

> 20. Within the treating relationship, the "physician must be sensitive to the
> imbalance of power in the patient-physician relationship, as well as to the
> patient's vulnerability[, and] must not allow differences with the patient or family
> about political matters to interfere with the delivery of professional care." *Code of
> Medical Ethics* Opinion 2.3.4. *Political Communications.*

---

[6] Dr. Madera alerted HHS to the AMA's concerns during the Final Rule's notice and comment period. Madera Decl.
¶ 3 (citing July 31, 2018 letter—available at http://www.regulations.gov/document?D=HHS-OS-2018-0008-
179739—from AMA to HHS).

Madara Decl. (ellipses and alterations in original).

Dr. Madera concludes that "the Final Rule would require doctors to violate each of these fundamental ethical and professional norms."[7] Madara Decl. ¶ 21. In examining the Final Rule, it is readily apparent how Dr. Madera reached his conclusion. The Final Rule, by requiring a referral for prenatal care to a woman seeking an abortion, and by requiring that the patient receive unnecessary counseling in addition to abortion counseling, mandates that providers provide medical information that patient does not need and, almost certainly, does not request. Those requirements also prohibit the physician from basing the counseling or referral on the patient's actual medical needs. By requiring that any list provided for an abortion referral contain some providers who do not perform abortions, and by prohibiting physicians from identifying the abortion providers, the Final Rule "is an instruction to physicians to intentionally mislead patients, which, if followed, is an instruction for physicians to directly violate the *Code of Medical Ethics*[.]"[8] Madera Decl. ¶ 25 (citing Opinions 1.1.1, 1.1.3, 1.2.3, 2.1.3, and 2.3.4).

As the Final Rule contradicts this persuasive evidence from the leading expert on medical ethics, HHS must have a plausible explanation outlining its rationale for rejecting the evidence and reaching a different conclusion. *Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43. Once again, however, HHS's justifications are lacking. HHS simply brushes aside any concerns and, in a generic and conclusory fashion, asserts the Final Rule violates no ethical obligations. As HHS's response to comments is relatively brief, and demonstrates the agency never addressed,

---

[7] Although this opinion only references Dr. Madera's declaration, Plaintiffs presented numerous expert opinions, each essentially arriving at the same conclusion reached by Dr. Madera. Other than relying on the Final Rule itself and *Rust*, HHS provided no evidence in rebuttal.

[8] Should the ACA in fact apply to the Final Rule, the objections noted by Dr. Madera indicate the Gag Rule likely violates each of the six limitations Congress imposed on HHS's rulemaking authority.

and does not appear to have even considered, the specific objections noted above, I include

HHS's entire explanation:

> The Department disagrees with commenters contending the proposed rule, to the extent it is finalized here, infringes on the legal, ethical, or professional obligations of medical professionals. Rather, the Department believes that the final rule adequately accommodates medical professionals and their ethical obligations while maintaining the integrity of the Title X program. In general, medical ethics obligations require the medical professional to share full and accurate information with the patient, in response to her specific medical condition and circumstance. Under the terms of this final rule, a physician or APP may provide nondirective pregnancy counseling to pregnant Title X clients on the patient's pregnancy options, including abortion. Although this occurs in a postconception setting, Congress recognizes and permits pregnancy counseling within the Title X program, so long as such counseling is nondirective. The permissive nature of this nondirective pregnancy counseling affords the physician or APP the ability to discuss the risks and side effects of each option, so long as this counsel in no way promotes or refers for abortion as a method of family planning. It permits the patient to ask questions and to have those questions answered by a medical professional. Within the limits of the Title X statue and this final rule, the physician or APP is required to refer for medical emergencies and for conditions for which non-Title X care is medically necessary for the health and safety of the mother or child.

84 Fed. Reg. at 7724.

Although acknowledging that medical ethics "require the medical professional to share

full and accurate information with the patient, in response to her specific medical condition and

circumstance," the agency nowhere squares that requirement with the Final Rule's requirement

that all abortion counseling provide information not in fact specific to the patient's medical

needs. Despite acknowledging providers must share accurate information with the patient, HHS

requires any referral for abortion contain, at minimum, an equal amount of information that is of

no use to the pregnant woman. That HHS appears to have failed to seriously consider persuasive

evidence that the Final Rule would force providers to violate their ethical obligations suggests

that the rule is arbitrary and capricious. *See Tesoro Alaska Petroleum Co. v. F.E.R.C.*, 234 F.3d

27 – OPINION AND ORDER

1286, 1294 (D.C. Cir. 2000) ("The Commission's failure to respond meaningfully to the evidence renders its decisions arbitrary and capricious. Unless an agency answers objections that on their face appear legitimate, its decision can hardly be said to be reasoned.").

The Final Rule could well be arbitrary and capricious in other aspects as well. Plaintiffs argue HHS failed to adequately account for the impact the Final Rule will have on women, particularly women in rural areas. Because the Final Rule forces providers to choose between violating ethical obligations or leaving the Title X program, many providers, including Planned Parenthood, informed HHS during the notice and comment period that if HHS implemented the proposed regulation, the providers would exit the program. Planned Parenthood serves approximately 40% of all Title X patients. Custer Decl. ¶ 8. Planned Parenthood's importance to the program is difficult to overstate. "Rural and sparsely populated areas will be harmed most. In those areas, Planned Parenthood is often the only safety-net reproductive health care provider available to patients seeking publicly funded services. In more than half of the counties were Planned Parenthood health centers were located in 2015 (238 of 415), Planned Parenthood served at least half of the women by obtaining publicly supported contraceptive services from a safety-net health center. In nearly 10% of the rural counties (38 of 415), Planned Parenthood was the only safety-net family planning center." *Id.* ¶ 37 (internal footnotes omitted). Planned Parenthood's absence would create a vacuum for family planning services. "Other safety-net clinics that are not forced from Title X will not be able to pick up the slack and provide care to the 1.6 million women, men, and adolescents who today receive vital family planning services from Planned parenthood health centers that participate in the Title X program." *Id.* ¶ 54.

The elimination of Title X providers would be detrimental to the public health. Many women, but especially low-income women, have no interactions with health care providers

28 – OPINION AND ORDER

outside of a Title X provider. Brandis Decl. ¶ 18. The Final Rule will increase not only unintended (and riskier) pregnancies, *id.* ¶ 23, but abortions as well, *id.* ¶ 26. Reduced access to Title X health centers will result in less testing, increased STIs, and more women suffering adverse reproductive health symptoms. *Id.* ¶ 29.

One would imagine HHS relied on studies and research to determine the impact on women's health should a provider of nearly half of all Title X services withdraw from the program. If HHS in fact relied on something, it is not shown in this record. In fact, HHS does not acknowledge the Title X program stands to be cut in half on May 3, 2019. Instead, HHS baldly asserts that "these final rules will contribute to more clients being served, gaps in service being closed, and improved client care . . . ." 84 Fed. Reg. at 7723. HHS anticipates new providers will step forward, providers who earlier stayed away from the program due to abortion-related concerns. But HHS fails to show its work. There is no transparency and no way to find out what, if anything, HHS based its assumptions on. The record is devoid of comments from potential providers ready, willing, and able to fill the 1.6 million woman gap in coverage left by Planned Parenthood's exit. Again, when HHS issued the above findings, it knew that, should it implement the Final Rule, it would lose the provider of nearly half of all Title X services within two months. It could be that HHS relied on some internal reports or studies. But on this record, HHS's unsupported conclusions appear to run "counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

As Plaintiffs have demonstrated a likelihood of success on the merits of their claims that the Final Rule is contrary to law and arbitrary and capricious. I turn next to whether Plaintiffs have shown "that irreparable injury is likely in the absence of an injunction." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (quoting *Winter*, 555 U.S. at 22). As HHS failed to introduce

29 – OPINION AND ORDER

any evidence on this issue, the only evidence before me is that if the Final Rule goes into effect, many Title X providers will exit the program because, amongst other reasons, the Final Rule violates established standards of medical ethics. Notably, Planned Parenthood will exit Title X if the rule is implemented. Kost Decl. ¶ 109; ECF No. 53. Although many other providers state they too will exit the program, Planned Parenthood is of unique importance because its "health centers serve 41% of women who rely on Title X sites for contraceptive care." *Id.* ¶ 110. In Vermont, Planned Parenthood is the lone provider of Title X services. Holmes Decl. ¶¶ 6, 19. In fact, every state plaintiff submitted declarations stating they will lose much, if not all of their current Title X funding should the rule go into effect. States' Br. 35-37. The likely harm to the public health, in the form of an increase in sexually transmitted disease and unexpected pregnancies, is not speculative. Brandis Decl. ¶¶ 31, 47. This harm to the public health will have a detrimental economic impact on the states. The Ninth Circuit has recognized that such economic harm (stemming from likely cuts to birth control), and supported by evidence analogous to the declarations provided here, sufficiently demonstrates a threat of harm to a state's economic interest. *Azar*, 911 F.3d at 571-73. Additionally, the *Azar* court concluded such harm is sufficient to establish a likelihood of irreparable injury. *Id.* at 581 (noting that because the APA permits relief "other than money damages," such economic harm was irreparable) (quoting 5 U.S.C. § 702)).

Additionally, the balance of the equities and the public interest tips sharply in favor of the Plaintiffs. "The public interest is served by compliance with the APA." *Id.* "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). There is ample evidence at this stage that the Final Rule is unlawful. The unrebutted evidence demonstrates, at this stage of the proceedings, that the

30 – OPINION AND ORDER

Final Rule would force medical providers to violate their ethical and professional obligations. Additionally, there is little harm in preserving the status quo. The current regulations have been in place for nearly 50 years and have an excellent track record. With such substantial questions surrounding the legality of the Final Rule, and with the potential for great harm to low-income women in particular should the rule go into effect, these prongs of the preliminary injunction standard tilt quite heavily in Plaintiffs' favor.

The Ninth Circuit recently outlined concerns regarding overbroad injunctions. *See Azar*, 911 F.3d at 583-84 (noting detrimental impact on development of law and effects on non-parties). In crafting an injunction, "[t]he scope of remedy must be no broader and no narrower than necessary to redress the injury show by the plaintiff[s]." *Id.* at 584. Here, Planned Parenthood operates in 48 states. Plaintiff AMA's member physicians practice and reside in every state in the country. Madara Decl. ¶ 7. AMA members (physicians and licensed health care practitioners) provide counseling to pregnant women in the Title X program. *Id.* There is ample evidence regarding the potential harm to the public health of not only the plaintiff states, but the nation. Brandis Decl. ¶¶ 35-37, 45-54. Given that the harm to Plaintiffs would occur in every state, and considering the balance of equities and the fact that Plaintiffs have demonstrated significant likelihood on the merits of their claims that the Final Rule is contrary to law, a nationwide injunction is appropriate.[9]

---

[9] On Friday, HHS filed a response to a notice filed Thursday regarding an injunction issued by Judge Bastian in the Eastern District of Washington. Judge Bastian entered a nationwide injunction prohibiting HHS from implementing the Final Rule. HHS argues there is no longer any likelihood of imminent harm. I disagree. As I understand it, the order submitted as an exhibit to ECF No. 137 is a preliminary ruling which Judge Bastian intends to follow with a final opinion sometime before May 3, 2019. Additionally, the Court understands Judge Chen in the Northern District of California issued an injunction last Friday restraining HHS from implementing the rule in California. HHS here states it is considering appealing Judge Bastian's injunction, and asks this Court to stay this matter. Specifically, HHS states that "Should the government seek and obtain a stay of the Washington Order, the Plaintiffs could move this Court to lift the stay, at which point the Court would be in a position to rule promptly." ECF No. 138, 3. The Court will allow a full briefing regarding whether a stay is appropriate. At this point, a ruling on the pending motion

## CONCLUSION

Plaintiffs' motions for a preliminary injunction are GRANTED in full. Defendants, and

their agents and officers, are restrained from implementing or enforcing any portion of the Final

Rule detailed in 84 Fed. Reg. 7714-7791 (March 4, 2019) and shall preserve the status quo under

the current regulations pending further order from the Court. No bond is required.

IT IS SO ORDERED.

DATED this ___29___ day of April, 2019.

_____
Michael J. McShane
United States District Judge

---

is appropriate. Planned Parenthood provides service for nearly half of the entire Title X program. They are a plaintiff
in this action, not the action pending before Judge Bastian.